E.J.S., Appellant,

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES,** Appellee.

No. S–2233.

Supreme Court of Alaska.

May 6, 1988.

Karl E. Heimbuch, Anchorage, for appellant.

Elizabeth Page Kennedy, Asst. Atty. Gen., Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Susan C. Kery, Asst. Public Advocate, and Brant McGee, Public Advocate, Anchorage, Guardian Ad Litem.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

PER CURIAM.

E.J.S. appeals from the termination of his parental rights to his daughter, L.M.S.

## I.

L.M.S. was born on July 13, 1978 in Washington State. Her natural parents are L.B. and E.J.S. In 1979, L.B. left E.J.S., taking L.M.S. with her. With the exception of a four hour visit occurring in 1984 in Everett, Washington at the initiation of L.B., E.J.S. did not see L.M.S. between 1979 and the time of the termination hearing in May, 1987.

After obtaining a divorce from E.J.S., L.B. married J.M. The two had a daughter, A.T.M., in 1982. The four lived as a family and L.M.S. considered her stepfather as her real father and A.T.M. as her sister. However, due to J.M.'s sexual abuse of L.M.S. and A.T.M. and L.B.'s alcoholism, their home situation was very unstable.

In 1984, L.B. abandoned L.M.S. and A.T.M. at the home of a babysitter and both girls came into the custody of the State Department of Health and Social Services. Subsequent efforts by the State to reunite L.B. with her daughters proved unsuccessful.

When the State took custody of the girls, L.M.S. and A.T.M. were placed in a foster home. The girls have resided there since. Apparently, the foster parents have agreed to adopt both L.M.S. and A.T.M. pending the results of the termination proceedings. L.M.S. has required continuous therapy from Dr. Elinor Weeks, a child psychologist, since August 1, 1984. Dr. Weeks testified that L.M.S. will continue to require psychotherapy until she is at least in her twenties.

In January, 1987, the Department of Health and Social Services petitioned the superior court to terminate the parental rights of L.B. and E.J.S. to L.M.S. On March 26, 1987, L.B. voluntarily relinquished her parental rights to L.M.S., and the superior court entered an order terminating her parental rights.

The superior court held a hearing on May 4, 1987 to determine whether to terminate E.J.S.'s parental rights to L.M.S. E.J.S. participated in the hearing telephonically. The court found that L.M.S. was a child in need of aid and terminated E.J.S.'s parental rights. E.J.S. appeals.

## II.

■ To terminate parental rights under AS 47.10.080(c)(3),[1] a court must find by clear and convincing evidence that (1) as a result of parental conduct, the child is a "child in need of aid" under AS 47.10.-010(a)(2), and (2) the parental conduct is likely to continue. *E.A. v. State*, 623 P.2d 1210, 1212–13 (Alaska 1981). We hold that the superior court did not commit reversible error in finding that L.M.S. was a child in need of aid and that E.J.S.'s conduct was likely to continue.[2] Thus, we affirm the termination of E.J.S.'s parental rights to L.M.S.

### A. Was L.M.S. a "child in need of aid?"

■ A child who has been physically abandoned by one parent after the other parent has voluntarily relinquished his or her parental rights is a "child in need of aid." AS 47.10.010(a)(2)(A)(iii).[3] To deter-

---

**1.** AS 47.10.080(c) provides:

   (c) If the court finds that the minor is a child in need of aid, it shall

   . . . . .

   (3) by order, upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights, terminate parental rights and responsibilities of one or both parents and commit the child to the department or to a legally appointed guardian of the person of the child, and the

department or guardian shall report annually to the court on efforts being made to find a permanent placement for the child.

**2.** In reviewing the trial court's underlying factual findings and decision to terminate parental rights, we apply the "clearly erroneous" standard and reverse the trial court only if "we are left with the definite and firm conviction that a mistake has been made." *E.A. v. State*, 623 P.2d 1210, 1212 (Alaska 1981).

**3.** AS 47.10.010(a)(2)(A)(iii) provides:

   (a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as other-

mine whether a child has been physically abandoned, we have developed a two-prong test: (1) whether the parent's conduct evidenced a disregard for his or her parental obligations, and (2) whether that disregard led to the destruction of the parent-child relationship. *Nada A. v. State*, 660 P.2d 436, 439 (Alaska 1983); *see also D.M. v. State*, 515 P.2d 1234, 1237 (Alaska 1973).

The first prong of the abandonment test focuses on the objective conduct of the parents in discharging their parental responsibility. Thus, abandonment is not determined by the parent's subjective intent or on the "parent's wishful thoughts and hopes for the child." *D.M.*, 515 P.2d at 1237. Parental duty has been described as an "affirmative duty ... [which] requires [a] continuing interest in the child and a genuine effort to maintain communication and association with the child." *In re Burns*, 379 A.2d 535, 540 (Pa.1977) (citations omitted). Thus, a parent has the duty to make reasonable efforts to locate and communicate with his or her child. Token efforts by a parent to communicate with his or her child are insufficient to satisfy this parental duty. *See Adoption of McKinstray*, 628 P.2d 1286, 1287 (Utah 1981).

The record shows that E.J.S. did not make reasonable efforts to locate and communicate with his daughter. E.J.S. claims that he did not know where L.B. and L.M.S. resided at any time after they left him in 1979 and that he continually tried to locate L.M.S. by contacting L.M.S.'s maternal grandparents and maternal great grandmother and other friends of L.M.S. However, both L.M.S.'s maternal grandfather and maternal great grandmother testified that E.J.S. never contacted them. Furthermore, the record shows little or no effort to locate L.M.S. in the years 1984 to 1987. Although E.J.S. testified that he called directory assistance in Anchorage to get L.B.'s phone number, E.J.S. never contacted the State Division of Family and Youth Services, the Alaska State Troopers, the Alaska Police Department or the Alaska Child Support Enforcement Division despite knowing in 1984 that L.B. lived in Anchorage. Nor did E.J.S. ever come to Anchorage to try to find L.M.S.

As for the second prong of the abandonment test, we must determine whether E.J. S.'s conscious disregard of his parental responsibilities led to the destruction of the parent-child relationship. First, the parent-child relationship between E.J.S. and L.M. S. was destroyed. L.M.S. considered her stepfather, J.M., to be her natural father. When she discovered that J.M. was not her real father, L.M.S. never asked about the details of her real father. Dr. Elinor Weeks, the child psychiatrist treating L.M.S., testified that no psychological bond or familial relationship existed between E.J.S. and L.M.S. Dr. Weeks further testified that a relationship between E.J.S. and L.M.S. probably could not be established until L.M.S. is at least 18 years old. Additionally, Linda Gonzales, the social worker handling L.M.S.'s case for the State, testified that she did not believe any bond existed between L.M.S. and E.J.S. Second, the evidence shows that the lack of a parent-child relationship was engendered by E.J. S.'s conscious disregard of his responsibilities. When asked her opinion on why L.M. S. and her natural father had no such bond between them, Dr. Weeks flatly stated: "Because she's had no exposure to her natural father."

After reviewing the record, we are not left with the firm conviction that the superior court erred in concluding that, having been abandoned by her natural father, L.M. S. is a "child in need of aid" under AS 47.10.010(a)(2)(A).

wise provided in this chapter, when the court finds the minor

.   .   .   .   .

(2) to be a child in need of aid as a result of
(A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian or rela-

tive caring or willing to provide care, including physical abandonment by

.   .   .   .   .

(iii) one parent if the other parent's rights and responsibilities have been terminated under AS 47.10.080 or voluntarily relinquished....

**B. Was E.J.S.'s conduct likely to continue?**

■ The superior court also had to find that E.J.S.'s conduct was likely to continue before it could terminate E.J.S.'s parental rights. AS 47.10.080(c)(3); *see also E.A.*, 623 P.2d at 1213. E.J.S. argues that the superior court failed to make this finding.

The superior court did make an explicit finding that E.J.S.'s conduct was likely to continue:

> [T]he evidence is clear and convincing that you have not taken the necessary steps that you should have taken in order to play that important role as a father in this child's life. I find that the child is a child in need of assistance because of the conduct of your ex-wife and of you and I find that the conduct on your part, even though you now express an interest in the child and the care of the child, that it comes late in the day. *And I find that —I believe that it would be conduct that would continue to put her at risk as a child in need of assistance.*

(Emphasis added.)

After reviewing the record, we believe that the trial court's finding that E.J.S.'s conduct was likely to continue was not clearly erroneous. Ms. Gonzales testified that E.J.S.'s conduct was likely to continue. Additionally, the record contains evidence of a battering and violent relationship during the one year that L.B. and L.M.S. lived with E.J.S. More currently, at the time of the termination hearing, E.J.S. was incarcerated for assaulting his girlfriend.[4] Finally, the eight years of abandonment by E.J.S. leads to the conclusion that E.J.S.'s conduct was not an isolated incident unlikely to continue. *Cf. Nada A.*, 660 P.2d at 440.

### III.

■ We find no merit in E.J.S.'s claim that he was denied his right to effective assistance of counsel and his due process right to confront and cross-examine witnesses against him due to his inability to hear the proceedings. First, E.J.S.'s counsel was present in the courtroom and did effectively cross-examine the witnesses. Second, a reading of the transcript shows that E.J.S. could hear well enough to follow the proceedings as he promptly responded to questions addressed to him. Finally, telephonic participation in judicial proceedings is provided for by court rule. *See* Alaska R.Civ.P. 99; Alaska Child in Need of Aid Rule 3(f).

E.J.S. also argues that the trial court erred in denying his motion for a continuance. Finding no merit, we explicitly reject this contention.

The judgment of the trial court is based on findings of fact which are not clearly erroneous. We AFFIRM.

---

4. In *Nada A.*, we implied that involuntary incarceration cannot be considered in determining whether a parent abandoned his or her child because abandonment requires the willful acts of a parent and involuntary incarceration is not willful. 660 P.2d at 439. In this case, E.J.S.'s incarceration itself is not relevant, but the conviction for which he is being incarcerated is relevant. E.J.S. was convicted of assaulting his girlfriend. We believe that a recent conviction of that nature is relevant to whether E.J.S. would continue his pattern of abandoning his daughter.