In the Matter of H.C., A Minor Under the Age of Eighteen (18) Years,

**D.K., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.**

No. S–7643.

Supreme Court of Alaska.

April 17, 1998.

478

Douglas K. Rickey, Furlong & Rickey, Juneau, for Appellant.

Jan A. Rutherdale, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

## OPINION

COMPTON, Justice.

### I. FACTS AND PROCEEDINGS

D.K. and R.C., respectively the father and mother of H.C., lived together for eight months with R.C.'s four-year-old son, M.C. Five months after the relationship ended, and R.C. moved out, she gave birth to H.C. Until H.C. was one year old, R.C. had sole custody of H.C.; she denied D.K.'s paternity. At that time, D.K. obtained a court declaration that he was H.C.'s father. Three days prior to entry of D.K.'s paternity order, the Division of Family and Youth Services (DFYS) filed a Petition for Adjudication of Child In Need of Aid (CINA) and for temporary placement of H.C. After a hearing, the superior court issued an order giving the State temporary custody.

At D.K.'s request, DFYS permitted D.K. to have supervised visitation with H.C. for one hour, twice a month, in the DFYS Juneau field office. DFYS admitted that it did not plan to place H.C. with D.K. permanently, but it requested information from D.K. to evaluate the possibility of "increased visitation and an increased active parental role."[1] DFYS requested "(1) a recent psychological evaluation; (2) documentation of how [D.K.] planned to care for H.C.'s basic needs [including a scheduled home visit by a social worker to assess the appropriateness of the living conditions]; (3) information on how he would provide day care; and (4) evidence of his parenting ability." Later, DFYS filed an amended petition for CINA adjudication and temporary placement for H.C., alleging that D.K. was unable to care for H.C. In its petition, DFYS stated that D.K. had a history of mental illness and domestic violence

---

1. Concurrently, DFYS provided services to R.C. with the goal of reunifying H.C. with her mother. R.C. had access to the "AWARE shelter; Public Health; the Infant Learning Program and other services offered by REACH, including services to help obtain housing, social security income, and the supported living program; the family resource specialist through the Division of Mental Health and Developmental Disabilities; and the Parent Family Center." These services were ultimately unsuccessful, and R.C. voluntarily terminated her parental rights. DFYS's evaluation of D.K. provided that he must address his mental illness before such support services could benefit him.

against R.C., prior felony convictions involving weapons, no suitable housing, and that D.K. had failed to demonstrate an ability to meet H.C.'s basic needs.

D.K. submitted to DFYS two psychological evaluations—one conducted by Dr. John Kesselring and one by Dr. Anthony Mander.[2] He attempted to enroll in parenting classes at Parent Aid in Juneau,[3] and he continued to visit H.C. The superior court held a CINA hearing at which D.K. admitted that H.C. was a child in need of aid, and that he was unable to care for her at that time. Two months later, D.K. moved to Hyder, and eventually to El Paso, Texas. D.K. did not notify DFYS or leave a forwarding address when he left Juneau. In Texas, D.K. met with Dr. Garry Feldman, a licensed clinical psychologist. While D.K. was in Texas, a disposition hearing on the CINA adjudication was held and H.C. was committed to state custody under AS 47.10.080(c)(1).[4] H.C. was then only twenty-seven months old. One year later, DFYS petitioned to terminate D.K.'s parental rights under AS 47.10.080(c)(3),[5] alleging that D.K. had had no contact with H.C. for over one year and had abandoned her. D.K. was still living in Texas and had not seen H.C. since leaving Juneau.

In a January 1996 hearing, DFYS presented four witnesses to support its position that D.K.'s parental rights should be terminated: Diane Sly, an interventionist with the Infant Learning Program; Dr. Mander, the Juneau psychologist who had evaluated D.K. in 1993; Joanne Gibbens, the DFYS social worker who had handled H.C.'s case between March 1993 and April 1994; and Ileta Iler, the DFYS social worker assigned to the case after August 1994. D.K. presented three witnesses in his defense: Jake Lofton, a family friend who had observed D.K.'s parenting skills; Diane Downs, D.K.'s roommate of six months in Juneau; and Dr. Feldman, the El Paso psychologist who had spent ten sessions with D.K. The trial court terminated D.K.'s parental rights after the hearing.[6] D.K. appeals the superior court's order.[7]

2. Dr. Mander concluded that D.K. was likely suffering from a paranoid mental disorder, probably paranoid schizophrenia, and that "it was inadvisable to allow D.K. custody unless his illness could be managed." He said that D.K. did "not accept the diagnosis of mental illness" and could not "deal with highly stressful situations in a functional manner." Dr. Kesselring agreed with Dr. Mander's diagnosis, and recommended that DFYS not allow D.K. to parent H.C. until D.K. has had intensive therapy for an extended period of time and his parenting ability is then reassessed.

3. D.K. states that he was "rebuffed in his attempt to enroll in parenting classes." Parental Aid in Juneau would not enroll D.K. in classes unless he first completed counseling regarding anger management.

4. AS 47.10.080(c)(1) states in part:
   (c) If the court finds that the minor is a child in need of aid, it shall
   (1) order the minor committed to the department for placement in an appropriate setting for a period of time not to exceed two years....

5. AS 47.10.080(c)(3) states in part:
   (c) If the court finds that the minor is a child in need of aid, it shall
   ....
   (3) by order, upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights, terminate parental rights and responsibilities of one or both parents and commit the child to the department....

6. DFYS simultaneously petitioned for the termination of R.C.'s parental rights with respect to H.C. and her other child, M.C. R.C. voluntarily relinquished her parental rights to her children, and an order terminating her parental rights followed.

7. In his statement of points on appeal, D.K. raised six issues. However, his brief argues only that the State failed to present clear and convincing evidence on three issues: (a) that H.C. needed aid because of D.K.'s parental conduct within the meaning of former AS 47.10.010(a)(2)(A) (see infra note 8); (b) that H.C. needed aid because she had suffered substantial physical harm within the meaning of former AS 47.10.010(a)(2)(C); and (c) that any adverse parental conduct by D.K. was likely to continue. We deem the other three issues abandoned. See Kodiak Elec. Ass'n, Inc. v. DeLaval Turbine, Inc., 694 P.2d 150, 153 n. 4 (Alaska 1984) (holding that even though the issue was included in appellant's points on appeal statement, the issue was abandoned because appellant failed to adequately brief it).

## II. *DISCUSSION*

### A. *Standard of Review*

■ We will reverse a trial court's factual findings in terminating parental rights only if they are "clearly erroneous," meaning that we are "left with the definite and firm conviction that a mistake has been made." *E.J.S. v. State*, 754 P.2d 749, 750 n. 2 (Alaska 1988) (cited in *A.M. v. State*, 891 P.2d 815, 820 (Alaska 1995)).

### B. *Did the Trial Court Clearly Err in Terminating D.K.'s Parental Rights?*

■ A court may terminate parental rights under AS 47.10.080(c)(3) if it finds by clear and convincing evidence that a child is in need of aid under AS 47.10.010(a)[8] as a result of parental conduct, and that the parental conduct is likely to continue if there is no termination of rights. *See A.M.*, 891 P.2d at 819. D.K. admitted that H.C. was a child in need of aid. The State then had the burden of proving "the existence of grounds for termination by clear and convincing evidence." *Id.* at 820; *see also* AS 47.10.080(c)(3); CINA Rule 15(c).

### 1. *Is H.C. a child in need of aid as a result of parental conduct?*

■ A child is in need of aid as a result of parental conduct when, *inter alia*, one parent has physically abandoned the child and the other parent has voluntarily relinquished his or her parental rights. *See* former AS 47.10.010(a)(2)(A)(iii)(renumbered as AS 47.10.010(a)(1)(C)). R.C. voluntarily relinquished her parental rights to H.C. Therefore, if the court properly found that D.K. physically abandoned H.C., then H.C. is a child in need of aid as a result of parental conduct. This court has developed a two-pronged test to determine whether a child has been physically abandoned: "(1) whether the parent's conduct evidenced a disregard for his or her parental obligations, and (2) whether that disregard led to the destruction of the parent-child relationship." *E.J.S.*, 754 P.2d at 750–51; *see also Nada A. v. State*, 660 P.2d 436, 439 (Alaska 1983).

### a. *Did D.K.'s conduct evidence a disregard for his parental obligations to H.C.?*

■ The first prong of the abandonment test concentrates on the parent's "objective conduct ... in discharging [his or her] parental responsibility." *E.J.S.*, 754 P.2d at 751. The court does not consider "the parent's subjective intent, or ... the 'parent's wishful thoughts and hopes for the child.'" *Id.* (quoting *D.M. v. State*, 515 P.2d 1234, 1237 (Alaska 1973)). A parent has an "'affirmative duty ... [to show] continuing interest in the child and [to make] a genuine effort to maintain communication and association'"; token efforts to communicate with a child will not satisfy this duty. *Id.* (quoting *In re Burns*, 474 Pa. 615, 379 A.2d 535, 540 (1977)).

At first D.K. followed DFYS's suggestions in order to increase his parental participation with H.C. He visited H.C. under supervision at the DFYS field office. The social worker who observed D.K. during these visits described him as "very nurturing" and "calm in his manner." He was examined by two psychologists, Dr. Mander and Dr. Kesselring. He called Parent Aid to enroll in parenting classes, and he installed childproof safety devices around his home in anticipation of unsupervised visitation.

After seven months of visitation, D.K. left Juneau without leaving a forwarding address or notifying DFYS. He eventually moved to Texas. He did not try to contact H.C. after leaving Juneau and moving to Texas. The

---

**8.** Former AS 47.10.010(a)(2)(A)(iii) provided in part:

(a) Proceedings relating to a minor ... are governed by this chapter ... when the court finds the minor

....

(2) to be a child in need of aid as a result of

(A) ... having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by

....

(iii) one parent if the other parent's rights and responsibilities have been ... voluntarily relinquished.

This subsection was renumbered AS 47.10.010(a)(1)(C) in September 1996, after the superior court ruled in this case.

State argues that D.K.'s actions constitute abandonment. The State contends that a parent is required to "maintain communication and association with the child" and that D.K. failed to do so. D.K. claims that he did not communicate with H.C. during his absence because "H.C. was less than two years old at the time he left Juneau, and [he] had only been allowed very restricted access to H.C. up to that time." The State maintains that, even at that young age, H.C. could understand the meaning of "gifts, cards, or brief letters."

D.K. claims that, while in Texas, he "sought the help of mental health professionals ... in an effort to satisfy the State's demand that he deal with his mental problems," and that this "demonstrated a regard for [his] parental obligation." The State suggests that D.K. is asking the court to consider the "reasons or emotions behind [his] actions" and to ignore his objective behavior. The State argues that, to refute its evidence of objective conduct amounting to abandonment, D.K. would have had to show that he maintained at least some contact with H.C.

The State's argument is persuasive. D.K. might have had "wishful thoughts and hopes for the child" and their future when he moved to Texas and began therapy. However, the fact of the matter is that he left Alaska without leaving any forwarding address and had no contact with his daughter for over one year.

■ Additionally, D.K. contends that disregard for parental obligations must be willful to constitute abandonment. D.K. argues that his leaving Juneau was not willful conduct. He contends that avoiding stress is part of his paranoid schizophrenia and therefore cannot be considered willful. According to D.K.,

> Dr. Mander's testimony indicates that he believed D.K. suffered from a mental condition that, when triggered by stress and/or fear, caused him to respond by

physically removing himself from the stressful situation. To the extent that D.K.'s absence from Juneau was a product of that mental condition, and out of his control, the absence was not necessary (sic) willful.

D.K. relies on *Nada A.* for the proposition that a parent's absence must be willful in order to constitute abandonment.

In *Nada A.,* Nada murdered her abusive husband, the father of her child. *See* 660 P.2d at 438. She fled Fairbanks while released on an appellate bond after her sentencing, leaving her child at a babysitter's house. *See id.* After nine months Nada turned herself in and was incarcerated. *See id.* DFYS had taken emergency custody of Nada's child and was seeking termination of her parental rights. *See id.* The trial court orally referred to her incarceration as evidence of her abandonment of her child, although its written findings of fact only referred to her nine-month abandonment after leaving her child with a babysitter. Nada argued that "in order to constitute abandonment, the acts of the parent must be willful" and that "incarceration was beyond her control." *See id.* at 439. This court suggested that Nada's absence from her child due to incarceration was not "willful" and therefore should not be determined to be abandonment. *See id.*[9] However, this court also concluded that the trial court's alternative reason—that she fled the city for nine months and left her child with a babysitter—could sustain a finding that Nada abandoned her child. *See id.*

The State concedes that "the acts of the parent must be willful in order to constitute abandonment." However, the State argues that the applicable analogy to *Nada A.* is not to Nada's involuntary incarceration, but to her leaving Fairbanks unexpectedly and willfully to "escape mounting social pressures." On this point, this court held that her flight

---

9. After that suggestion a justice commented in a concurrence that "AS 47.10.080(c)(3), by its express terms, does not permit the superior court to consider ... incarceration when determining whether to terminate parental rights." *Nada A. v. State,* 660 P.2d 436, 442 (Alaska 1983) (Compton, J., concurring). There was similar *dicta* in a

1995 case. *See A.M. v. State,* 891 P.2d 815, 829 & n. 8 (Alaska 1995). The legislature in 1996 "responded to [this] Court's invitation ... to create a statutory basis for making [involuntary] incarceration a factor that can be considered in termination proceedings...." Ch. 89, § 1, SLA 1996 (describing new AS 47.10.080(*o*)).

"provide[d] sufficient objective evidence indicating disregard of parental obligations" to justify terminating her parental rights. *Id.*

The State's argument is again persuasive. D.K. has not persuaded us that the rationale of *Nada A.* to which the State points does not apply with equal force to his circumstances.[10]

### b. *Did D.K.'s conduct destroy the parent-child relationship?*

The second prong of the abandonment test concerns whether the parent's disregard for his or her responsibilities led to the destruction of the parent-child relationship. *See E.J.S.*, 754 P.2d at 750–51. There must be a causal link between the parent's conduct and the relationship's destruction. *See A.M.*, 891 P.2d at 823 ("The destruction must be brought about by the acts of the parent ...."); *see also In re B.J.*, 530 P.2d 747, 750 n. 12 (Alaska 1975). Moreover, "[t]he best interests of the child are relevant to the [second prong] question, because it is indicative of a breakdown of the parent-child relationship if the child's best interests are promoted by legal severance of the relation." *In re B.J.*, 530 P.2d at 749 (quoting *In the Matter of the Adoption of A.J.N.*, 525 P.2d 520, 523 (Alaska 1974)).

The superior court found that "there is no parent/child relationship, and that there never was that relationship." The court also found that D.K.'s absence from Juneau from April 1994 until the termination hearing "ha[d] destroyed any chance of a parent-child relationship ... being developed."

D.K. argues that the trial court's finding is clearly erroneous, because the State never alleged that D.K.'s conduct had destroyed all chances of a future relationship between him and H.C. He points out that "none of the witnesses called by the State testified that there was no chance of a parent-child relationship being developed." This argument lacks merit. D.K. misinterprets the trial court's findings and the applicable abandonment test. It is not relevant whether D.K. might someday develop a parent-child relationship with H.C. What is relevant is the relationship between the parent and the child at the time of the hearing, and whether the parent's conduct destroyed the relationship. *See Nada A.*, 660 P.2d at 440 n. 4 (holding that the "relevant period [was that] prior to filing a petition to have [the parent's] rights terminated").

It is undisputed that D.K. had no relationship with H.C. during her first year because R.C. denied D.K.'s paternity and kept them apart. During the seven months that D.K. had visitation with H.C.,[11] the child began to recognize him and smiled when she saw him. However, Ileta Iler, the social worker handling H.C.'s case for the State, testified that by the time of the termination trial H.C. "never talked about" D.K. and had no memory of his visits.

The State contends that D.K. destroyed whatever chance he had to develop a parent-child relationship with H.C. when he failed to continue visitation at the DFYS office and moved to Texas.

The superior court found that, because of D.K.'s absence from Juneau after March

---

**10.** One could distinguish the present case from *Nada A.* on the ground that the evidence here tended to show that D.K.'s departure from Juneau was impelled by his mental illness, whereas in *Nada A.* the evidence showed only an impulsive departure from town motivated by "mounting social pressures." *Nada A.*, 660 P.2d at 439. Yet none of the evidence concerning D.K.'s mental illness suggested that he was so profoundly impaired as to lack capacity for willful conduct. Even if the evidence could be interpreted as showing that D.K.'s mental illness made his departure from Juneau essentially involuntary, this would not explain his year-long failure to contact H.C., her foster parents, or DFYS. Notably, the explanation D.K. currently offers for his prolonged loss of contact has nothing to do with

mental illness or lack of willfulness: in his brief, D.K. justifies his failure to contact H.C. by suggesting that she was simply too young for meaningful communication. This explanation tacitly concedes that D.K.'s post-departure failure to communicate with his daughter reflected voluntary conduct and was not the product of his mental illness.

**11.** D.K. visited H.C. nine times in the seven months that he lived in Juneau and was allowed supervised visitation with H.C. He did not see her between March 11, 1994, when H.C. was about twenty-two months old, and January 18, 1996, when the termination trial began.

1994, no relationship exists between D.K. and H.C. The finding that D.K.'s disregard of his parental obligations destroyed any chance of having developed a parent-child relationship is not clearly erroneous.

The superior court's determination that H.C. is a child in need of aid as a result of parental conduct is affirmed.

### 2. Is D.K.'s conduct likely to continue?

After a trial court has determined that a child is in need of aid as a result of parental conduct, it must determine whether that conduct is likely to continue. See A.M., 891 P.2d at 825; see also Nada A., 660 P.2d at 440. The superior court found "clear and convincing evidence that the parental conduct which causes [H.C.] to be a child in need of aid is likely to continue if the parental rights of [D.K.] are not terminated."

D.K. argues that he has begun to confront his mental illness through his work with Dr. Feldman, thereby decreasing the chance that his paranoid behavior will affect H.C. He states that this contradicts the superior court's finding of clear and convincing evidence that his conduct will continue. D.K. began seeing Dr. Feldman before the State filed its petition to terminate D.K.'s parental rights. Dr. Feldman saw D.K. ten times and concluded that D.K. "was willing to accept help." D.K. contends that he built a "trusting relationship" with Dr. Feldman, something he did not have with Dr. Kesselring or Dr. Mander in Juneau, a place where D.K. felt "threatened."

Dr. Mander testified that D.K. would need psychological treatment before he could have the responsibility of caring for H.C. Dr. Mander concluded that, without treatment, D.K. would be likely to continue to disappear in the face of stressful situations. The superior court found that D.K. has refused to acknowledge and accept treatment for his problem. That refusal kept the court "from being able to find that [D.K.] is able to provide for a child." The court also found that D.K.'s doctor in Texas, Dr. Feldman, was an "advocate [for D.K.] in this matter" and that D.K. went to Dr. Feldman "not for treatment and therapy but for support and to [have him] testify."

Dr. Mander and Dr. Kesselring testified that, without treatment, D.K. would likely react to stress by physically leaving the area. Although Dr. Feldman's testimony was more supportive of D.K.'s position, the court found that Dr. Feldman's testimony was not as trustworthy as that of the other two doctors. The court found that D.K. had not begun treatment for his mental disorder and had only gone to Dr. Feldman to receive support and to have him testify on D.K.'s behalf. The superior court did not clearly err in finding that D.K.'s conduct was likely to continue.

### 3. Did the trial court clearly err when it found H.C. to be a child in need of aid under AS 47.10.010(a)(2)(C)?

D.K. argues, and the State agrees, that the superior court erred when it found that H.C. was a child in need of aid under former AS 47.10.010(a)(2)(C).[12] The superior court noted that D.K.'s "history of assaultive conduct and paranoid behavior ... affects his ability to provide a safe and stable home for [H.C.]" and found that "[w]ithout treatment, there is an imminent and substantial risk that [she] would suffer substantial physical harm if she were placed in [his] care." There was no evidence, however, that H.C. had ever suffered any physical harm from D.K. No testimony warned of future physical harm—only a "frightening," "harmful," and "nomadic" lifestyle if H.C. was placed with D.K. The State concedes that "there is insufficient evidence to support a finding that

12. Former AS 47.10.010(a)(2)(C) states in part:
(a) Proceedings relating to a minor ... are governed by this chapter ... when the court finds the minor
....
(2) to be a child in need of aid as a result of
....
(C) the child having suffered substantial physical harm or if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent, guardian, or custodian or the failure of the parent, guardian, or custodian adequately to supervise the child.
This section was renumbered AS 47.10.010(a)(3) in September 1996, after the ruling in this case.

[H.C.] would be in imminent and substantial risk of substantial physical harm" if placed in D.K.'s care.

We conclude that the superior court clearly erred when it found H.C. to be a child in need of aid under former AS 47.10.010(a)(2)(C). The court's decision to terminate parental rights does not rest solely on this finding, however, and thus we need not reverse that decision.[13]

## III. CONCLUSION

We AFFIRM the trial court's finding that H.C. is a child in need of aid as a result of parental conduct under former AS 47.10.010(a)(2)(A)(iii), and that said conduct is likely to continue. We AFFIRM the termination of D.K.'s parental rights. We REVERSE the finding that H.C. is a child in need of aid under former AS 47.10.010(a)(2)(C).

---

**13.** The trial court had already found that H.C. was a child in need of aid under former AS 47.10.010(a)(2)(A)(iii).