v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF FAMILY AND YOUTH SERVICES, Appellee.

No. S–10027.

Supreme Court of Alaska.

March 8, 2002.

**20.** 945 P.2d at 305; *A.A.,* 982 P.2d at 263.

Kenneth C. Kirk, Kenneth Kirk & Associates, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Barbara L. Malchick, Deputy Public Advocate, Brant McGee, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

P.M. appeals the superior court's termination of his parental rights to his son, J.M.H. Because we find that the superior court did not violate P.M.'s statutory or due process rights to counsel, did not err in terminating his parental rights, and did not err in failing to place the child with P.M.'s parents, we affirm the superior court's opinion in its entirety.

## II. FACTS AND PROCEEDINGS

P.M.'s son, J.M.H., was born in January 1993. During the first two years of his life, J.M.H. lived with his mother, E.H.,[1] in Vancouver, Washington. What, if any, contact P.M. had with his son during this time is disputed in the record.[2] It is not disputed that P.M. knew of the child's existence and whereabouts during those two years. The mother moved to Alaska with her two sons around 1995 and P.M. has had no further contact with J.M.H.

The mother and children were discovered in a wooded area in Alberta, Canada in August 1996, in need of food, shelter, clothing, and medical care. J.M.H. had an infected foot that had not been treated. The children were taken into protective custody by the Canadian authorities, and later transferred to the care of the Anchorage authorities. The State filed a petition for adjudication of children in need of aid (CIN A) on August 28, 1996. The superior court adjudicated J.M.H. and his half-brother children in need of aid and committed them to the temporary custody of the Division of Family and Youth Services (DFYS). On November 15, 1997, both children were placed in the home of J.M.H.'s older half-brother's biological father and stepmother, Mr. and Mrs. C. The C.'s have consistently expressed their desire to adopt J.M.H.

P.M. has a history of criminal activity, and has been in and out of jail in Washington and Oregon for several years for a variety of drug-related and violent crimes. He was incarcerated in Washington when the children were taken into protective custody and was released just months before trial. He has a history of anger management problems.

In January 1998 DFYS filed a petition for termination of parental rights of E.H. and P.M. At that time, P.M. had not yet been located, nor had he had contact with DFYS. In March 1998 DFYS located P.M. in prison in Washington state, and served him with the petition to terminate parental rights. P.M. was assigned counsel in May 1998. In June the court ordered paternity testing that con-

---

1. The termination of E.H.'s parental rights to J.M.H. and his older half-brother J.J.H. was upheld by this court in *E.H. v. State, Dep't of Health & Soc. Servs.,* 23 P.3d 1186 (Alaska 2001).

2. At trial, the clinical psychologist testified that it appeared J.M.H. had "only seen his dad once or twice." Judge Gonzalez found that P.M. had no contact with his son for the first six years of the child's life. However, P.M.'s mother wrote to P.M.'s attorney that P.M. had visited J.M.H. when he was a baby.

firmed P.M. was the father of J.M.H., and the court vacated the termination trial set for the following month.

Starting in January 1999, DFYS prepared a number of case plans for P.M., working to integrate him into his son's life. The case plans generally focused around P.M.'s anger management problems. P.M. did not comply with any of these case plans.

On June 24, 1999, DFYS filed an amended petition for termination of parental rights for both E.H. and P.M. E.H.'s parental rights were terminated by the superior court in December 1999. Trial on termination of P.M.'s parental rights was scheduled for early January 2000.

In November 1998 P.M. attempted to fire his court-appointed attorney, who was eventually allowed by the court to step down due to threatening letters he received from P.M. Just prior to his scheduled trial date, P.M. attempted to fire his new court-appointed attorney, filed a complaint against his attorney with the bar association, and moved to have new counsel appointed. Given a choice to continue with his attorney or to proceed pro se, P.M. refused to accept either option, and his attorney was allowed to step down. Superior Court Judge Rene J. Gonzalez refused to appoint new counsel; however, the judge continued the trial for nearly six months to allow P.M. time to be released from prison and attend the trial.

The trial was held June 26–28, 2000. P.M. proceeded pro se. The court heard testimony from the DFYS social worker, J.M.H.'s therapist, P.M.'s counselor at the Washington state penitentiary, and a clinical psychologist. At the conclusion of the trial, the superior court terminated P.M.'s parental rights to J.M.H.

## III. STANDARD OF REVIEW

 In a CINA case, this court will overturn a superior court's findings of fact only if they are clearly erroneous.[3] We review de novo whether the superior court's findings comport with the requirements of the CINA statutes and rules.[4] When interpreting statutes [5] and constitutional law,[6] this court applies its independent judgment, "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy." [7]

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Refusing To Grant P.M. Replacement Counsel.

When P.M.'s original counsel resigned (for reasons unrelated to this case) the superior court appointed Thom Janidlo to represent P.M. P.M. soon became unhappy with Janidlo's performance. He wrote a number of letters to Janidlo that Janidlo interpreted as threatening, culminating in a letter purporting to "fire" Janidlo.[8] P.M. unsuccessfully moved to have the court appoint new counsel, alleging that Janidlo was ineffective. Janidlo then requested permission to withdraw, citing the "threats of harm" in letters he had received from P.M., and the court permitted Janidlo to step down.[9]

In September 2000 the State moved the court to appoint new counsel for P.M. and the court appointed Jim Hopper as replacement counsel. P.M. quickly became unhappy with Hopper. Just before trial was scheduled to begin, P.M. filed a bar complaint against Hopper, "fired" him, and petitioned the court to assign yet another attorney. The superior court heard discussion on the issues of whether to allow Hopper to step down and whether to appoint new counsel in his place.

**3.** *In re S.A.*, 912 P.2d 1235, 1237 (Alaska 1996).

**4.** *E.M. v. State, Dep't of Health & Soc. Servs.*, 959 P.2d 766, 768 (Alaska 1998).

**5.** *Longwith v. State, Dep't of Natural Res.*, 848 P.2d 257, 260 n. 5 (Alaska 1992).

**6.** *Brandon v. Corrections Corp. of America*, 28 P.3d 269, 273 (Alaska 2001).

**7.** *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**8.** P.M. also filed a complaint against Janidlo with the bar association.

**9.** P.M. unsuccessfully appealed this decision.

Hopper told the court that, given the pending bar complaint, he felt his interests were "somewhat in conflict" with P.M.'s, and that he did not feel he could represent P.M.'s interests. After discussion, the judge gave P.M. a choice:

THE COURT: Either Mr. Hopper goes forward and represents you, you've already .... went through one attorney. So either it's Mr. Hopper or you proceed pro se.

P.M.: Sir, I will never waive my rights to effective representation of counsel. There is a conflict of interest that exists with me and Mr. [Hopper], he does not want to do his job, there is absolutely no way in the world that I'm going to accept representation as what Mr. [Hopper] has been showing he is going to provide for me. There's no way I'm going to proceed pro se and give up my statutory rights to counsel. I refuse to allow the attorney to-to represent me from here forward....

Following this exchange, the judge granted Hopper's application to withdraw, citing the bar complaint and Hopper's assertion that he and P.M. could no longer communicate, and ordered that P.M. proceed pro se unless he retained private counsel. Despite objections from the State, the guardian ad litem, and the attorney for the foster father that a long delay went against the child's best interests and that P.M. was using this dispute as a delaying tactic, the judge continued the trial for nearly six months in order to allow for P.M.'s release from prison so that he could prepare his case and defend himself.

The trial took place June 26–28, 2000, with P.M. appearing pro se.[10] At the conclusion of trial, the superior court ruled that P.M.'s parental rights to J.M.H. would be terminated. In this appeal, P.M. argues that the superior court's refusal to appoint new counsel to replace Hopper was a violation of Alaska statutes and his due process rights under the Fifth Amendment to the U.S. Constitution and article I, section 7 of the Alaska Constitution.

### 1. Attorney Hopper did not provide ineffective assistance of counsel justifying his termination by P.M.

P.M. argued before the superior court that he was provided ineffective assistance of counsel and that this justified his discharge of Hopper. The standard for effective assistance of counsel is "that [counsel's] decisions, when viewed in the framework of trial pressures, be within the range of reasonable actions which might have been taken by an attorney skilled in the ... law, regardless of the outcome of such decisions."[11] Regarding P.M.'s arguments that Hopper provided ineffective assistance, the superior court concluded that P.M. "was manipulating the court." Judge Gonzalez wrote:

Both Mr. Thom Janidlo and Mr. James Hopper are attorneys who have many years of experience in representing clients in Child In Need of Aid proceedings and both have a proven record of representing clients in a highly professional manner. The fact that they were not willing to comply with every whim and unreasonable requests made by [P.M.] did not make their representation of him suspect or in any way incompetent.

Although finding that both Alaska Rules[12] and the Alaska Constitution guaranteed to P.M. the right to counsel, the judge conclud-

---

**10.** P.M. failed to appear for the first day of the trial. On day two he appeared and was allowed to listen to the tapes of the first day. Despite the trial having been calendared for only two days, the judge granted P.M.'s request to be allowed to put on his case on a third day to provide him time to organize his case. Upon reconvening on day three, the judge granted P.M.'s request for an additional hour to organize his notes.

**11.** *V.F. v. State*, 666 P.2d 42, 46 (Alaska 1983) (quoting *Risher v. State*, 523 P.2d 421, 424 (Alaska 1974)).

**12.** Alaska Child in Need of Aid Rule 12 provides in part:

(a) **Notice of Right to Counsel.** The court shall inform the parties at the first hearing at which they are present of their respective rights to be represented by counsel at all stages of the proceedings.

(b) **Appointed Counsel.** The court shall appoint counsel pursuant to Administrative Rule 12:

(1) for a parent or guardian who is financially unable to employ counsel[.]

ed that these provisions did "not grant [P.M.] the right to manipulate the court and continue to delay the termination of parental rights proceedings." He found that the tone and content of the letters sent by P.M. to both Janidlo and Hopper made it "clear that he is unwilling to communicate and cooperate with any attorney unless they respond to his every whim and unreasonable requests." He further found that it was "blatantly unfair for a court-appointed attorney to be placed in a position by [P.M.] of having to be concerned of threats of bodily harm or having to respond to a bar grievance even though it is not well founded." He therefore denied P.M.'s final motion for appointment of substitute counsel. The superior court's characterization of the nature of P.M.'s conduct with respect to his appointed counsel is amply borne out by the documentary evidence in the record.[13]

■ P.M. argues that he should, at the very least, have received a hearing on his claim of cause to discharge Hopper. P.M. sent a seven-page handwritten motion to the judge, seeking to have Hopper replaced and explaining his reasons.[14] He had previously alleged nearly identical grounds against Janidlo in writing. Having reviewed these pleadings we conclude that the judge did not err in considering these allegations so facially unpersuasive as not to require an evidentiary hearing.[15] In *J.L.P. v. V.L.A.* we recognized that where allegations are "so general or conclusory, and so convincingly refuted by competent evidence, as to create no genuine issue of material fact" no evidentiary hearing is needed.[16] This standard was satisfied in the present case.

### 2. P.M. was not denied due process of law.

■ P.M. correctly argues that the due process clause of the Alaska Constitution grants indigents the right to appointed coun-

13. In his very first letter to Janidlo, P.M. wrote "I AM either going to be a blessing to you, or a curse. But which of the two I AM to you, will be your choice. Because *I will* be one of the two." He also admitted to being "defensive" on the phone with Janidlo's office. In a subsequent letter to Janidlo, he reiterated that "I AM going to be to you either an eternal blessing, or a curse." P.M. later wrote to Hopper that

I have sent copies of my letters to the Bar Association as a protection.... But if I ever get suspcious [sic] of your motives or representation I will involve the Bar Association whether they like it or not and I will not let them not be involved with monitoring and supervising our attorney/client relationship if I have to write complaints to everyone in the World.

He wrote in another letter to Hopper that

I will be suiting (sic) my former attorney, you've got my word on this. Jim I'm not going to play games with you. You have a job to do, now I expect you to do it to the best of your ability. And if you've got a problem with that, then get out of the way. Because Jim I promise you you will not play games with my life without consequences.

Another letter reads: "Mr. Hopper don't try and play me for some fool. You can't tell me how the law reads on issues I have studied, so don't try bullshitting me. Save that drag for some jake who doesn't know any better." Throughout his correspondence, P.M. repeatedly demanded that his counsel submit particular motions; contact his family members; send him entire copies of large files; send him all discovery; and send him copies of all applicable laws as well as all Alaska

Court and Appellate Rules and DFYS/DHSS policies. He demanded that his counsel follow up on particular motions even when counsel appears to have disagreed with the motions or told P.M. that the legal authority contained in the motions did not apply to his case.

14. In his motion, P.M. alleged a "conflict of interest" with his attorney. He alleged that Hopper did not interview P.M.'s relatives (in Washington state) regarding J.M.H.'s placement; arrange for the DFYS case worker to fill out a visiting form for P.M.; file a motion to stay the proceedings until P.M. was out of jail (although Hopper did file for one continuance and appeared willing to file for another continuance to accomplish this goal); file a motion to have the presiding judge step down; ensure that the judge ruled on P.M.'s previously-entered pro se motions; return a copy of a newspaper article P.M. had sent him; send P.M. copies of all Alaska appellate rules and all annotated Alaska statutes; or send P.M. copies of all motions, pleadings and discovery in the case. Even if proven, this conduct would not constitute a conflict of interest between P.M. and Hopper, or ineffective assistance of counsel by Hopper.

15. The Alaska Bar Association came to the same conclusion, writing in a letter to P.M. that there was "an inadequate or insufficient basis for opening an investigation" into P.M.'s complaints against Hopper.

16. 30 P.3d 590, 595 (Alaska 2001) (citation omitted).

sel.[17] . But "[t]he right to the effective assistance of counsel does not extend . . . to the right to reject appointed counsel and have new counsel appointed in the absence of any showing of cause for such change."[18] Although P.M. claims that he did show cause (or was not given the opportunity to show cause) the record demonstrates, as we concluded above, that P.M. did not present a prima facie case of justifiable cause to fire either of his attorneys.[19]

■ We have upheld a number of court decisions refusing to appoint new counsel when the superior court had found that the request for replacement counsel lacked merit or was being used as a delay tactic.[20] Here, the superior court made such findings, and did not err in refusing to appoint replacement counsel.

■ The closer question is whether the superior court erred in dismissing Hopper. As P.M. correctly points out, he did not affirmatively waive his right to counsel. It might have been preferable in this case to have continued with the trial as scheduled, with Hopper remaining as P.M.'s attorney. But it was not error for the court to proceed as it did. Fundamental fairness is the main requirement of the due process clause.[21] Given the facts in this case—P.M.'s refusal to

work with two separate appointed attorneys, his threats against his attorneys, the bar complaint against one attorney and his threats of bar complaints, his aggressive and disturbing letters to his own and other attorneys, to the judge, and to his son's foster father—as well as the superior court's efforts to accommodate P.M. by delaying the trial, we find that the superior court's decision to have P.M. proceed pro se was not fundamentally unfair.

**B. The Superior Court Did Not Err in Terminating P.M.'s Parental Rights to J.M.H.**

■ The superior court found by clear and convincing evidence that J.M.H. was a child in need of aid under AS 47.10.011, and that P.M. had "failed within a reasonable time to remedy the conduct or conditions in the home that placed the child at substantial risk of harm so that returning the child to his care would place the child at substantial risk of physical and mental injury." The court found that P.M. had abandoned the child under AS 47.10.013 and had neglected the child under AS 47.10.014. The court specifically found that P.M. had abandoned J.M.H.[22] by leaving the child "without provision for the child's support and without meaningful communication with the child for

**17.** See V.F., 666 P.2d at 45.

**18.** Id. at 46 n. 5.

**19.** Filing a bar grievance against an attorney does not by itself destroy the attorney-client relationship or require the attorney to withdraw from representation. See Michigan Comm. on Prof'l and Judicial Ethics, Informal Op. RI 84 (1991) (a lawyer need not withdraw from representation when a client files a grievance against the lawyer provided that a disinterested lawyer would conclude that the grievance would not adversely affect the representation); cf. ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 94–384 (1994) ("A lawyer against whom a disciplinary complaint has been filed by opposing counsel in an ongoing matter is ordinarily neither required nor permitted on that account alone to withdraw from representing the client in the matter.").

**20.** See Coleman v. State, 621 P.2d 869, 877–78 (Alaska 1980) (upholding denial of motion for assignment of private counsel and denial of petition to withdraw after judge determined attorney

could properly represent his client, because "indigent defendants are not constitutionally entitled to counsel of their choice or private appointed counsel in lieu of a public defender attorney as a matter of right"); Bentley v. State, 393 P.2d 225, 230–31 (Alaska 1964) (upholding refusal to appoint new counsel, finding that state is not "obliged to appoint counsel in whom [the party has] confidence" so long as appointed counsel is "capable"); see also Mute v. State, 954 P.2d 1384, 1385 (Alaska App.1998) ("the right to effective assistance of counsel does not encompass the right to reject appointed counsel and have new counsel appointed in the absence of any showing of cause for such change"); Annas v. State, 726 P.2d 552, 557 (Alaska App.1986) (finding that "[t]he trial court fulfills its obligation under the United States and Alaska Constitutions when it makes available to a defendant a competent attorney. A defendant is not entitled to pick and choose among appointed counsel.").

**21.** See, e.g., State v. Mouser, 806 P.2d 330, 336 (Alaska App.1991).

**22.** Under AS 47.10.013.

the first six years of the child's life"; being "absent from the home for a period of time that created a substantial risk of serious harm to the child"; "fail[ing] to make reasonable efforts to locate and communicate with the minor child for the first six years of the minor's life"; and failing to offer financial assistance. Furthermore, the court found that despite P.M.'s failures, he was "given the opportunity to meaningfully participate in four suitable case plans by DFYS" and that "he failed to do so."

The court further found that P.M. had neglected J.M.H.[23] since birth by failing "to provide the child with adequate food, clothing, shelter, education, medical attention and other care and control necessary for the child's physical and mental health and development." The court found that P.M.'s "willful neglect" of the child created the conditions causing J.M.H. to be a child in need of aid, due to the "substantial physical and mental harm" caused by the mother during the father's absence.

◼ In *E.J.S. v. State, Department of Health and Social Services,* we held that "a parent has the duty to make reasonable efforts to locate and communicate with his or her child. Token efforts by a parent to communicate with his or her child are insufficient to satisfy this parental duty." [24] In that case, we affirmed the superior court's finding that the father had physically abandoned his child, and that his conduct was likely to continue.[25] That case is strikingly similar to this case. In *E.J.S.* the record showed that

the father had made little or no effort to locate his child for three years. The father, like P.M., was in Washington state, while the mother and child were in Alaska.[26] In *E.J.S.* we faulted the father for not contacting DFYS, the Alaska State Troopers, the Alaska Police Department, or the Alaska Child Support Enforcement Division for information, and not traveling to Anchorage to attempt to find his child.[27] Similarly, P.M. made no attempt to locate his son for three years, despite knowing that he was in Alaska.

The superior court additionally found by a preponderance of the evidence that the Department of Health and Social Services had made "timely reasonable efforts to provide support services to [P.M.] as required by AS 47.10.086. The Department prepared four case plans for [P.M.] ... that addressed his rehabilitative needs and the special needs of the minor child, and he refused and failed to meaningfully participate in said plans." Accordingly, the superior court terminated P.M.'s parental rights to J.M.H.[28]

◼ P.M. challenges the court's termination of his parental rights on the grounds that the facts do not support a finding of either abandonment or neglect. P.M. claims that the record does not support the court's finding that he had no contact with his son while his son was living in Washington state for the first two years of his life.[29] P.M. is correct that the record is not conclusive on this point. However, even if it were assumed that P.M. had contact with his child from 1993 to 1995,[30] it is uncontested that P.M.

23. Under AS 47.10.014.

24. 754 P.2d 749, 751 (Alaska 1988).

25. *Id.* at 751–52.

26. *Id.* at 750–51.

27. *Id.* at 751.

28. Termination of parental rights is governed by AS 47.10.088(a), which provides that parental rights may be terminated if a court finds:

 (1) by clear and convincing evidence that
 (A) the child has been subjected to conduct or conditions described in AS 47.10.011; and
 (B) the parent
 . . . .

 (ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury; and
 (2) by a preponderance of the evidence that the department has complied with the provisions of AS 47.10.086 concerning reasonable efforts.

29. P.M. does not affirmatively claim that he did have contact with his son during the first two years of his son's life, only that the record fails to prove that he did not have such contact.

30. Although not conclusive, the record best supports a conclusion that P.M. had limited, if any, contact with J.M.H. during this time, and provided little or no financial support.

had no contact with J.M.H. from 1995 until he was contacted by DFYS in 1998, and it is similarly uncontested that he made no effort to locate the child during this time. This is sufficient to satisfy the requirements for a finding of abandonment and neglect.

P.M. claims that he did not abandon his son, and that for a time he did not know the whereabouts of his son, except to know that the mother and children were in Alaska. Elsewhere in the record, however, he claimed that he knew the child's mother was on welfare and stated that it is easy to find people on welfare. There is no evidence that P.M. made any attempt to locate the mother or J.M.H. after they left Washington state in 1995.

In considering whether to terminate parental rights under AS 47.10.088, the court is instructed to consider the best interests of the child.[31] According to social workers and therapists, J.M.H. has "blossomed" in the home of the C.'s. When J.M.H. was first taken into protective custody at age four, he suffered seizures and developmental delays. He has now been with the C.'s for four years, is described as happy and secure, and refers to the C.'s as "mom and dad."[32]

At trial, J.M.H.'s social worker, Kathy Gray, testified that P.M. was not receptive to the need to participate in his case plan. She testified that DFYS was concerned about P.M.'s anger, that he "came across as threatening" in a letter he wrote to J.M.H.'s foster father, and that his letters to her were "threatening in nature and argumentative." She testified that he refused to undergo a psychological evaluation; that he refused to sign releases giving DFYS access to his records; that he did not comply with any of DFYS's case plans, despite their efforts to work with him; and that in all of her communication with P.M., he had never expressed any concern for J.M.H.'s well-being or shown any insight into the child's needs. Gray further expressed the opinion that P.M. had not shown an ability to provide a stable home for a young child with special needs like J.M.H.[33]

Regarding J.M.H.'s life with the C.'s, Gray testified that "[h]e's doing great," and that DFYS had concerns that removing him from his current home with the C.'s "would be very traumatic for him.... [H]e's basically been there almost half his life. And then to remove him into an unknown, unstable home would be not something that we would do." She further testified that J.M.H. identified Mr. C. as his "dad."

Clinical psychologist Susan LaGrande testified[34] that J.M.H. had progressed farther than most people had expected. She also testified to J.M.H.'s "very special bond" with his older brother, J.J.H., who had taken care of him while the two were in their mother's care. She commented that nowhere in the letters regarding his son did P.M. ever express concern for his son's welfare. She pointed out that P.M. does not have a stable work history, a stable drug-free history, or a record of stability and consistency that a special needs child would require. Dr. LaGrande described J.M.H. as "a specially needful child who is making progress, which is a very good positive thing here." She suggested that the special bond with his brother was extremely important, and that J.M.H. appeared to have bonded with his foster family.

J.M.H.'s counselor, Isa Jennings, testified that when the child entered state custody, he suffered from post-traumatic stress symptoms, nightmares, anxiety, fear, developmental delays, and epilepsy. She testified that J.M.H. "bonded really strongly" with his foster mother and "felt very safe and protected with her," and that he "blossomed" with the C.'s. She opined that removal from the C.'s' care would cause J.M.H. to "lose whatever

---

**31.** AS 47.10.088(c).

**32.** J.M.H. has lived with his older brother, J.J.H., his entire life, and removing J.M.H. from the C.'s' home would also separate him from his brother.

**33.** J.M.H. had been sexually abused by his mother, led a transient lifestyle for the first several

years of his life, suffered from seizures, threw temper tantrums, was very fearful, and was developmentally behind other children his age.

**34.** Dr. LaGrande testified on the basis of her review of the files in this case. She did not actually interview the various parties.

developmental gains he has made," and she worried that J.M.H.'s seizures might return.

DFYS's concerns about P.M.'s anger management issues are clearly supported by the record. Carla Schettler, P.M.'s case worker at the Washington state penitentiary, testified that P.M. "had a very negative attitude" and "was very confrontational" with her. She testified that during his time in prison, P.M. received multiple infractions for threatening other prisoners, refusing his cell assignment, and for threatening staff. P.M. also proved to be highly confrontational in his dealings with the court, and he sent a number of aggressive and/or threatening letters to his attorneys, other attorneys in the case, the judge, and his son's foster father.[35]

P.M. clearly failed to comply with any of DFYS's case plans and refused to cooperate with his social worker, Gray. He wrote to Gray that "[y]ou absoulteley [sic] do not have my permission for any information you asked for concerning me that you asked for on that confidential release form. And you MAY NOT have any other information that pertains to me for that matter." He wrote to the assistant attorney general regarding Gray: "I want this lady to stay away from me, if she sends me anything, I will reject it." Gray made several attempts to communicate with P.M. and the assistant attorney general also advised P.M. that it was in his best interest to work with Gray on a case plan. P.M., however, refused to take anger management or parenting classes,[36] to submit to a psychological evaluation, or to allow DFYS access to his criminal history, all of which were required by his case plans.

Based on all of the information in the record and testimony at trial, the superior court's decision to terminate P.M.'s parental rights to J.M.H. is clearly supported by the record. We therefore uphold the termination.

### C. The Superior Court Did Not Err in Refusing To Grant Custody of J.M.H. to the Parents of P.M.

■ P.M. argues that the superior court erred in refusing to grant custody of J.M.H. to P.M.'s parents. He argues that under AS 47.14.100(e),[37] the court is obligated to place the child with a blood relative unless it finds, based on clear and convincing evidence, that placement with the relative will result in physical or mental injury. P.M. contends that this standard was not met.

The guardian ad litem argues that AS 47.14.100(e) is not applicable. The last sentence of AS 47.14.100(f) (which concerns a relative who agrees that a child should be placed elsewhere) states that "[n]othing in this subsection or in (e) of this section applies to child placement for adoptive purposes." The guardian ad litem asserts that because J.M.H. is in a pre-adoptive home, AS 47.14.100(e) does not apply to this case. The guardian ad litem is correct.

In *S.S.M. v. State, Department of Health and Social Services*, this court wrote that "[t]he basic model of a 'placement for adoptive purposes' within the meaning of subsection .100(f) would seem to entail placement of a child with adults who wish to adopt the child."[38] In the current case, the C.'s have clearly expressed their desire to adopt J.M.H. Likewise, DFYS has repeatedly ac-

---

**35.** In a letter to J.M.H.'s foster father, P.M. wrote "I'm in prison for assaulting a cop. So understand I don't fear the cops." This is only one example of the many aggressive, disturbing, and threatening remarks contained in P.M.'s letters to people involved in this case.

**36.** P.M. completed one anger management class and one parenting class prior to formulation of the first case plan, but given his ongoing aggressiveness related to this case and the repeated infractions at the prison, DFYS requested that he retake the classes, which he refused to do.

**37.** AS 47.14.100(e) provides in pertinent part:
A child may not be placed in a foster home or in the care of an agency or institution pro-

viding care for children if a relative by blood or marriage requests placement of the child in the relative's home. However, the department may retain custody of the child and provide for its placement in the same manner as for other children if the department
(1) makes a determination, supported by clear and convincing evidence, that placement of the child with the relative will result in physical or mental injury; ... this determination may be appealed to the superior court to hear the matter de novo[.]

**38.** 3 P.3d 342, 347 (Alaska 2000).

knowledged its plan for the C.'s to adopt J.M.H. In *S.S.M.* we wrote:

> It is the specific purpose of the DFYS placement, not the general purpose of the custody granted to DFYS, that is important under subsection .100(f).... Thus subsection .100(f)'s "placement for adoptive purposes" language refers to DFYS's specific decisions concerning "placement" of a child in its custody, not to the court's threshold decision to give DFYS "custody" over the child.[39]

In this case, although the first two case plans, dated September 1996 and January 1997, listed permanency planning goals of "return[ing] home" (by which DFYS meant to return the children to the mother, not to P.M.), the permanency planning goal as of September 1997 became that of "adoption," by the C.'s.[40] DFYS's goal of adoption by the C.'s and the C.'s' expressed interest in the adoption are reiterated in each subsequent case plan. The grandparents first requested custody of J.M.H. in June of 1998, by which time J.M.H. was already living with the C.'s in a pre-adoptive home. Under AS 47.14.100(f) and *S.S.M.,* therefore, AS 47.14.100(e) does not apply to this case.

■ Putting the statutory issue aside, we note that the court's decision to deny the grandparents' appeal is supported by the record. J.M.H. has been living with the C.'s for more than four of his nine years. Testimony at trial showed that J.M.H. is very close to his brother and foster family, has made great strides toward overcoming his developmental problems, and is happy. The experts testified that removing him from that environment would not be in his best interests and would likely cause him to regress. We therefore uphold the superior court's refusal to place J.M.H. with P.M.'s parents.

## V. CONCLUSION

Because the superior court did not err in refusing to grant P.M. replacement counsel, in terminating P.M.'s parental rights, or in denying P.M.'s parents' appeal that J.M.H.

be placed with them, we uphold the superior court's opinion in its entirety.

AFFIRMED.

C.'s therefore has been consistent ever since it contemplated placing J.M.H. with the C.'s.

**39.** *Id.*

**40.** J.M.H. did not begin living with the C.'s until November 1997. DFYS's goal of adoption by the