SEAN B., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Office of Children's Services, Appellee.

No. S–13759.

Supreme Court of Alaska.

Jan. 21, 2011.

Rehearing Denied Feb. 16, 2011.

Fleur L. Roberts, Fairbanks, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

A father appeals the superior court's termination of parental rights to his son, argu-

ing that the court's conclusions were based on insufficient evidence and that the court made erroneous factual findings. Because the record supports the superior court's decision to terminate the father's parental rights, we affirm.

## II. FACTS AND PROCEEDINGS

Josh [1] was born April 5, 2001. His biological parents Sean and Melanie were in an "off and on" relationship for close to two years. About six weeks after Josh was born, Melanie met Mason, and the two soon married. Melanie and Mason had three children together: Kate, born in July 2002; Leon, born in October 2003; and Mia, born in July 2005. Earlier in her relationship with Mason, Melanie at times returned to Sean when she and Mason fought.

Josh, Melanie, and Mason moved around Arkansas and Indiana several times during Josh's first five years. They lived on their own at times; at other times they lived with Melanie's, Mason's, or Sean's relatives. Sean did not pay formal child support. Sean's mother Sarah occasionally gave Sean money, which he gave to Melanie when she visited him to ask for financial help.

Mason joined the army in 2006. He was transferred to Alaska in the fall of 2006. Melanie and the four children lived with Sean's family briefly before moving to Alaska to join Mason. Sean testified that he gave permission for Josh to move to Alaska because he did not want Josh to be separated from his half-siblings.

Melanie, Mason, and the children had been living in Alaska for roughly a year when the Office of Children's Services (OCS) started to have contact with them. On August 3, 2007, OCS received a report of harm, which alleged that the children were neglected and Melanie, their primary caregiver, was abusing crack cocaine and alcohol. OCS did not assume custody of the children at that time. Two days later Mason was arrested for domestic violence after throwing Melanie against the garage, injuring her arm and

1. Pseudonyms have been used to protect the privacy of all family members.

wrist. As a result, the military ordered Mason not have contact with Melanie.

On August 6 and 7, 2007, OCS social worker Jamie Batten made contact with Sean and Sarah in Arkansas. Batten notified them of Josh's contact with OCS and gathered some information about Sean's relationships with Melanie and Josh. Sarah expressed a desire to maintain contact with Josh.

On August 14, Mason was found at home with Melanie and the children. He had left the military barracks without permission and was escorted back by state troopers. Mason was then confined to the barracks and unable to care for the children.

On August 20, Melanie was arrested and incarcerated for domestic violence against her sister. Melanie injured her sister while intoxicated and angry. Her sister lived with the family and helped take care of the children.

A visit to the home showed that there were dried feces and urine stains on the carpet, urine-soaked clothes in the laundry room, and toys and clothes scattered throughout the house. The children did not have clean clothes, were dirty, and smelled of urine. There was no food at home. Neither Josh nor Kate was enrolled in school. Josh needed a speech therapist. It was not clear when the children had last seen a doctor. OCS assumed emergency custody of six-and-a-half year-old Josh and his siblings. On August 21, Batten filed an Emergency Petition for Child in Need of Aid Adjudication and Temporary Custody.

The case was soon transferred from intake worker Jamie Batten to Merrie Tullar, who oversaw the case for roughly the next two years. Tullar, who made contact with Sean in September 2007, encouraged him to send letters and photographs to reconnect with Josh. Written case plans also instructed Sean to send weekly correspondence to Josh. When Tullar spoke with Sean over the phone, she reiterated the importance of sending letters to Josh.

Sean and Melanie stipulated that there was probable cause that Josh was a child in need of aid as a result of Melanie's conduct. In April 2008, Josh and his half-siblings were placed with Mason's parents in Arkansas. When Josh came to live with his step-grandparents Lois and Trevor, roughly eight months had passed since Batten had notified Sean of concerns about Josh's care. Tullar later testified that by this time, she had not received any letters from Sean.

Mason and Melanie soon relocated to Arkansas separately. Mason then sought to have the child protection proceedings in Alaska dismissed. OCS opposed the motion, arguing that keeping the case in Alaska would provide necessary continuity and benefit the children. Superior Court Judge Robert B. Downes denied the motion to dismiss.

Tullar made contact with social worker Phillip Williams of the Arkansas Department of Health and Human Services. Williams worked with OCS to administer Josh's case plan. During the summer of 2008, while Tullar was on leave, OCS social worker Rebecca Buckles was assigned to Josh's case. That summer OCS changed the permanency plan from reunification to adoption. According to OCS records, Buckles spoke with Sean about terminating his parental rights on July 7, September 3, and September 22.

Sean and his mother testified that they had trouble contacting and keeping in touch with caseworkers. Tullar testified that she received one voice mail from Sean, which she returned the following day.

Around September 2008, Sean provided photographs to Arkansas social worker Williams to pass on to Josh. Before the end of 2008, Sean also sent Josh two letters and a Christmas gift. Lois admitted that she did not give Josh the first letter that she received from Sean because she considered Sean's statements in the letter about reuniting the family inappropriate and potentially confusing for Josh. Lois testified that she read Josh the second letter, shared the photographs with Josh, and gave Josh the Christmas gift from Sean. Lois testified that Josh did not receive a birthday gift from Sean. According to Sean's testimony, he stopped writing letters to Josh after he discovered that correspondence he had sent did not reach Josh.

In September 2008, OCS requested the Arkansas Department of Health and Human Services to conduct a home study and consider placing Josh with Sean under the Interstate Compact on the Placement of Children. Carl Scott, who supervised the Interstate Compact home study, testified at trial that Sean's case was open from September 10 to December 3. There was limited evidence of the Interstate Compact investigator's attempts to contact Sean during this period. Scott testified that a private contractor conducted the home study and that the records from its investigation had probably been destroyed under routine shredding procedures.[2] In December 2008, Scott denied placement with Sean. That same month OCS filed a petition to terminate Sean's parental rights.

Also in December 2008, Josh began to attend therapy sessions with licensed associate counselor Jillian Fennessee. A "month ... or two" after Josh had been placed with his step-grandparents in Arkansas in April 2008, Tullar made contact with Arkansas social worker Williams and asked him to seek counseling for Josh. But no counseling occurred for at least six months. Tullar testified that the delay in setting up these appointments was the result of a "communication breakdown" between OCS and the social workers in Arkansas. Josh had 17 counseling sessions with Fennessee between December 2008 and the beginning of the trial in September 2009. According to Fennessee's testimony, Josh came in with adjustment issues, disruptive behavior, daytime and nighttime wetting (enuresis), and difficulty expressing himself.[3] Fennessee testified that these issues improved in the time Josh lived with Lois and Trevor.

Around the time Josh began to meet with the counselor, the parties agreed to a new strategy for reintroducing Sean and Josh: Sean would contact Fennessee, who would help facilitate his contact with Josh. But the plan failed, and in the end, Sean met with Fennessee only once: Fennessee fit him into her schedule on March 11, 2009, the day after he missed a scheduled appointment. On two other occasions, Sean intended to meet with Fennessee but missed the scheduled appointments. The parties disagree about why Sean's first meeting, scheduled for January 19, did not take place. They also disagree about what role Sean played in setting up an appointment for April 29 and whether Sean should have been informed of the scheduled date when he visited Fennessee's office on April 28.

In addition to the scheduling problems, the parties had a misunderstanding about Fennessee's role in the reunification process. At first, OCS and Arkansas caseworkers believed that Fennessee was authorized to oversee the reunification; Sean believed Fennessee would hold sessions that he and Josh could attend together. According to Fennessee, she informed Sean in March that she could not conduct a reunification because she was not authorized to provide therapy to adults. She stated that she had a list of providers prepared for Sean, which he never picked up. Sean disputed this testimony, but the superior court concluded his testimony on this point was not credible. By May 2009, all the parties were informed that Fennessee could not provide direct services to Sean.

In August 2009, OCS and Arkansas caseworkers agreed to arrange a meeting for Sean, Lois, and Trevor to help them establish a healthier relationship. Sean was unable to attend the first meeting, scheduled for September 1, so they rescheduled for September 8. Sean met with Lois and Trevor under the supervision of a court-appointed special advocate. They discussed reintroducing Sean and Josh by having Sean attend Josh's soccer games. They agreed that Sean would attend some of Josh's soccer games and could spend time with Josh, Lois, and Trevor afterward. Sean could not attend the next game because he had a work conflict. Josh's team did not have a game the following week. The first game Sean could attend was the week of the termination-of-parental-rights trial.

Following the trial, Judge Downes concluded that Sean had engaged in conduct that constituted abandonment. In the court's words, this conduct "caused [Josh] to be a

2. Scott also testified that a notice sent to Sean during this process was returned to sender.

3. Lois and Tullar also testified about Josh's special needs and involvement in services.

child in need of aid independently of and subsequent to the situation in [Melanie]'s home" that led to the initial child-in-need-of-aid adjudication. The court also concluded that Sean failed to remedy this conduct, that OCS engaged in reasonable and tenacious efforts to reunify Sean and Josh, and that termination of Sean's rights was in Josh's best interests. Sean appeals.

## III. STANDARD OF REVIEW

■■■ Sean challenges factual findings and issues of law. We will conclude that a factual finding is clearly erroneous, and refuse to affirm that finding, if review of the entire record leaves us with "a definite and firm conviction that a mistake has been made."[4] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[5] Because "trial courts are in the best position to weigh witness credibility, ... we give particular deference to findings based on oral testimony."[6] Whether the record supports the statutory requirements for termination is a question of law to which we apply our independent judgment.[7]

## IV. DISCUSSION

The decision to terminate parental rights in this case is governed by title 47 of the Alaska Statutes and our precedent. In order to terminate parental rights under AS 47.10.088, the trial court must find, by clear and convincing evidence, that: (1) the child has been subjected to conduct or conditions described in AS 47.10.011 (that is, the child is in need of aid);[8] (2) the parent has not remedied the harmful conduct or conditions or has failed to address the conduct or conditions that are likely to harm the child in the future;[9] and (3) the State has made reasonable efforts to reunite the parent and child.[10] In addition, the court must find, by a preponderance of the evidence, that termination of parental rights is in the child's best interests.[11]

Sean raises several issues in his appeal, including claims that the State's evidence is insufficient to support the superior court's conclusions that he abandoned Josh and failed to remedy the conditions or conduct that made Josh a child in need of aid, that the State did not engage in "reasonable efforts" to reunite him with Josh, that the superior court's best-interests analysis was erroneous, and that other statutes bar the superior court's conclusions. In addition, Sean challenges several factual findings, which are addressed as they arise in the discussion below.

### A. The Superior Court Did Not Err In Concluding That Sean Abandoned Josh.

■■■ Sean challenges the superior court's conclusion that he abandoned Josh under AS 47.10.013. We have articulated a two-part test for reviewing cases of abandonment: "(1) [t]here must be parental conduct evidencing a 'willful disregard' for parental obligations, leading to (2) the destruction of the parent-child relationship."[12] We apply an objective test "to see if actions demon-

---

**4.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1267 (Alaska 2008) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.,* 7 P.3d 946, 950 (Alaska 2000)).

**5.** *Id.* (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 88 P.3d 527, 529 (Alaska 2004)).

**6.** *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 212 P.3d 756, 762 n. 16 (Alaska 2009).

**7.** *Maisy W.,* 175 P.3d at 1267 (citing *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 79 P.3d 50, 53 (Alaska 2003)).

**8.** AS 47.10.088(a)(1); *see also* AS 47.10.011.

**9.** AS 47.10.088(a)(2).

**10.** AS 47.10.088(a)(3).

**11.** *J.H. v. State, Dep't of Health & Soc. Servs.,* 30 P.3d 79, 86 n. 10 (Alaska 2001) (citing AS 47.10.088(b)–(c)); *see also* Child in Need of Aid Rule 18(c).

**12.** *Rick P. v. State, Office of Children's Servs.,* 109 P.3d 950, 957 (Alaska 2005) (citing *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 67 P.3d 648, 651–52 (Alaska 2003)).

strate a willful disregard of parental responsibility."[13] A showing of willful disregard under the first prong is not effectively refuted by evidence of "the parent's subjective intent or 'wishful thoughts and hopes for the child,' "[14] nor by "token efforts to communicate with [the] child."[15] Rather, a parent must show "continuing interest in the child and [... make] a genuine effort to maintain communication and association."[16] The second prong is satisfied if there is a causal connection between the parent's conduct and the destruction of the relationship.[17] We have concluded that "it is indicative of a breakdown of the parent-child relationship if the child's best interests are promoted by legal severance of the relation."[18]

The record in this case supports the conclusion that Sean abandoned Josh under this two-part test. Tullar testified that in April 2008, when Josh had been in custody for approximately eight months, she had not received a single letter from Sean, despite her instructions to send letters and re-establish contact with Josh. Based on the testimony of Fennessee and other evidence, the superior court found Sean "missed appointments or showed up on the wrong day at the wrong time, and he repeatedly failed to nurture his child." And the superior court credited Tullar's testimony that Sean showed no sense of urgency about reconnecting with his son.

Faced with conflicting testimony, the superior court found Sean "did not show any compulsion, any zeal, to be a parent to [Josh]." Specifically, the court determined that Sean's testimony about sending weekly correspondence to Josh was not credible. The court also determined that Sean's testimony that Fennessee failed to inform him

that she would be unable to oversee the reunification was not credible.

Sean argues that he provided photographs and letters for Josh in September 2008. This is supported by testimony from Sean and other witnesses. The State does not contest the fact that Sean provided Josh with some photographs and two letters; however, the State persuasively argues that these communications are " 'token efforts[,]' ... insufficient to satisfy Sean's parental duty."

According to the superior court, Sean's "pattern of behavior demonstrates that he has failed to objectively manifest a desire to be involved in [Josh]'s life." Sean asserted that he wanted to be a part of Josh's life. Without more, these manifestations of subjective intent do not outweigh the evidence that Sean was inattentive to Josh.[19] The evidence described above satisfies the objective standard for "willful disregard of parental responsibility" under the first prong of the abandonment test; the superior court properly applied the legal standard.

We now turn to the second prong of the abandonment test: whether Sean's disregard of parental responsibility led to the destruction of his relationship with Josh. The evidence supports this conclusion. Sean did not meet with Josh in person for two years, from September 2007 to September 2009. His correspondence with Josh was limited, and the evidence suggested that his son did not know much about him. The superior court found that Sean failed to "remedy the disruption" in his relationship with Josh. This finding is supported by evidence of Sean's failure to comply with the case plan, to send letters,[20] and to attend meetings. This evi-

**13.** *Jeff A.C., Jr. v. State,* 117 P.3d 697, 704 (Alaska 2005).

**14.** *Id.* (citing *G.C.,* 67 P.3d at 652).

**15.** *Id.* (citing *D.K. v. State, Dep't of Health & Soc. Servs. (In re H.C.),* 956 P.2d 477, 481 (Alaska 1998)) (quoting *E.J.S. v. State, Dep't of Health & Soc. Servs.,* 754 P.2d 749, 751 (Alaska 1988)).

**16.** *Id.* (citing *H.C.,* 956 P.2d at 481) (internal quotation marks omitted).

**17.** *H.C.,* 956 P.2d at 483 (quoting *E.J.S.,* 754 P.2d at 750–51).

**18.** *Id.* (quoting *In re B.J.,* 530 P.2d 747, 749 (Alaska 1975)).

**19.** *See also R.J.M. v. State, Dep't of Health & Soc. Servs.,* 946 P.2d 855, 868 (Alaska 1997) (explaining that "a parent's stated willingness" to care for children is not enough to preclude finding that the child is in need of aid (citing *O.R. v. State, Dep't of Health & Soc. Servs.,* 932 P.2d 1303, 1310 (Alaska 1997))).

**20.** The superior court disbelieved Sean's testimony that he sent weekly letters to Josh.

dence satisfies the second prong of the test for abandonment. There is clear and convincing evidence that Sean abandoned Josh; the superior court did not err in reaching this conclusion.

## B. The Superior Court Did Not Err In Concluding That Sean Failed To Remedy Josh's Abandonment.

 Sean challenges the superior court's conclusion that he failed to remedy the conduct that placed Josh at substantial risk of harm. Sean argues that the State presented insufficient evidence to support this conclusion. Before terminating parental rights under AS 47.10.088, the court must find by clear and convincing evidence that the parent has not remedied the conduct that placed the child at substantial risk of harm.[21] In making this determination, AS 47.10.088(b) directs courts to consider any fact relating to the best interest of the child including the parent's efforts; the history of harmful conduct or conditions created by the parent; the likelihood that harmful conduct will continue; and the likelihood of returning the child to the parent within a reasonable time, considering the child's age and needs. "The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[22]

Taken together, the facts suggest that Sean's efforts to remedy harmful conditions and conduct were minimal, that his pattern of inattentive conduct contributed to Josh's behavioral problems, that this pattern was likely to continue, and that it was unlikely Josh would be returned to Sean's care in a reasonable time. Sean's correspondence with Josh was limited. Sean's communications with social workers and service providers were irregular. There is no evidence suggesting that Sean took serious interest in Josh's life beyond stating that he wanted his son back. For example, Sean did not seek information regarding Josh's foster family in Fairbanks,

his emotional and behavioral problems, or how he was adjusting to his life in Arkansas. The record is also missing evidence that would show Sean took any initiative to play a role in Josh's life, such as finding out more about Josh's living conditions or trying to establish a relationship with Josh's caretakers. Arkansas social workers had denied Josh's placement with Sean; it was not clear how long a new determination would take. In light of these facts, it appeared unlikely that Sean would address Josh's needs in the near future.

In his reply brief, Sean asserts that he provided care and support to his son the best he could in light of the circumstances. There is indeed evidence that Sean cared for Josh in his first years of life; that when Josh first moved to Alaska, Sean tried to keep in touch through webcam; that Sean called Tullar to ask about Josh; and that Sean wanted to be a good father to Josh. These isolated facts are insufficient to disrupt the conclusion that Sean failed to remedy the conduct and conditions threatening Josh's well-being. The weight of the evidence supports the State's argument that after the State took custody of Josh, Sean "took an altogether passive role in parenting" and did not remedy the situation as required by AS 47.10.088(a)(2).

The superior court found that Sean expected "others would exert all the efforts and he could sit back and wait." According to the superior court, Sean "did not show any compulsion ... to be a parent to [Josh]. Instead, he appeared content to let it happen to him if it would." The court also found that Sean's lack of monitoring and initiative caused a "disruption in the parent-child relationship" and that Sean failed to change his conduct "in any meaningful way over the course of the case." Although the superior court did not list the factors identified in AS 47.10.088(b), its findings demonstrate a thorough consideration that satisfies the requirements of this provision.[23] The superior court

---

**21.** AS 47.10.088(a)(2).

**22.** *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 74 P.3d 896, 902–03 (Alaska 2003) (affirming trial court determination that parent failed to remedy harmful conditions within a reasonable time).

**23.** *See Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children Servs.,* 175 P.3d 1222, 1226 n. 5 (Alaska 2008) ("[T]he superior court made findings and a conclusion that appear to satisfy [AS 47.10].011(8).")

did not err in concluding that Sean failed to remedy the harmful conduct or conditions that rendered Josh a child in need of aid.

### C. The Superior Court Did Not Err In Concluding That The State Engaged In Reasonable Reunification Efforts.

■■■■ Sean challenges the superior court's conclusion that the State made reasonable efforts to reunite him with Josh. Sean argues that there was insufficient evidence in the record to support this conclusion. Before terminating parental rights under AS 47.10.088, the court must find by clear and convincing evidence that the State made timely and reasonable efforts to provide services to the family for the purpose of reunification. Alaska Statute 47.10.086 elaborates on this requirement. The State must:

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

(2) actively offer the parent or guardian, and refer the parent or guardian to, the services ... whenever community-based services are available and desired by the parent or guardian; and

(3) document the department's actions.... [24]

The State has some discretion in determining what efforts to pursue and whether the timing is reasonable.[25] A parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide.[26]

The superior court found that OCS created three reunification plans, first requiring Sean to write letters to Josh, next requiring him to meet with Josh's counselor, and finally facilitate meetings between Sean, Lois, Trevor, and later Josh. OCS also provided paternity testing, requested a home study through the Interstate Compact on the Placement of Children, conducted regular meetings, and participated in mediation sessions. The record contains evidence that Tullar and her colleagues at OCS stayed abreast of Josh and Sean's situation, tried to maintain contact with Sean, encouraged Sean to reconnect with Josh under the terms of the case plan, and tried to help Sean navigate the Arkansas child protection system. OCS workers continued to coordinate efforts after Josh relocated to Arkansas. Based on this evidence, the superior court concluded that "OCS's efforts ... were reasonable, tenacious, suited to their purpose and unsuccessful."

The record includes some contrary evidence. OCS had some difficulty bringing reunification plans into effect and balanced the goal of reunification against other goals. There were break-downs in communication between OCS, the Arkansas social workers, and Fennessee. OCS workers sought voluntary relinquishment of parental rights and were cautious about reintroducing Sean and Josh. These efforts reflect OCS's interest in finding a permanent and stable living arrangement for Josh and a concern that contact with Sean might upset Josh. Not all of OCS's efforts were aimed directly at placing Josh in Sean's care or protecting Sean's visitation rights, but the fact that OCS helped facilitate Josh's placement outside the father's home does not undercut the conclusion that OCS engaged in reasonable efforts in this case.[27] The superior court found that

---

24. AS 47.10.086.

25. See *Jeff A.C., Jr. v. State*, 117 P.3d 697, 706 (Alaska 2005) ("In determining reasonable efforts, we permit the state to consider the 'amount of time available' for reunification, considering how long the child has been in foster care and whether allowing more time for reunification would not be in the child's best interests." (citing *G.C. v. State, Dep't of Health & Soc. Servs.*, 67 P.3d 648, 653 & n. 23 (Alaska 2003))); *see also G.C.*, 67 P.3d at 653 (noting that opportunity for reasonable efforts was limited by parent's incarceration).

26. *Cf. Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1019–21 (Alaska 2009) ("[A] parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts [under ICWA].") (internal quotation marks omitted).

27. The requirement that OCS engage in reasonable efforts under AS 47.10.088 helps to ensure that parental rights are not terminated without sufficient cause. The same statute makes clear, however, that where the requirements are met, termination of parental rights is justified "for purposes of freeing a child for adoption or other

Sean's "failure to participate in his case plan has prevented OCS from progressing in its efforts to reunify [Josh] with [Sean]. The fault for this is [Sean]'s and not the department's." This finding is supported by the record.[28] The limits of OCS's success in connecting Sean with services and introducing him to Josh do not bar the court from concluding that the reasonable efforts requirement was satisfied.

OCS caseworkers made efforts to maintain contact with Sean, connected him with services, and documented communications as required under the statute. The record provides clear and convincing evidence that OCS met the statutory requirements for "reasonable efforts." The superior court did not err in reaching this conclusion.

### D. The Superior Court Did Not Err In Concluding That Termination of Sean's Parental Rights Was In Josh's Best Interests.

■■■ Sean challenges the superior court's conclusion that termination of parental rights was in Josh's best interests.[29] Under AS 47.10.088(c) and Alaska Child in Need of Aid Rule 18(c)(3), the trial court must determine, by a preponderance of the evidence, whether termination of parental rights is in the best interests of the child. In making this determination, the court may consider (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent,[30] as well as favorable present placements (or lack thereof).[31]

The evidence in this case supports the conclusion that termination of parental rights was in Josh's best interests. Josh has found a stable and loving home with his step-grandparents Lois and Trevor. Lois and Trevor have also taken in Josh's three half-siblings. The court heard testimony that Josh needs stability and attention to his special needs. Sean has failed to show his commitment to Josh through regular and reliable contact. Sean has not demonstrated the ability to meet Josh's needs. The superior court did not err in concluding that termination of Sean's parental rights is in Josh's best interests.

### E. Sean's Other Arguments Lack Merit.

#### 1. Alaska Statute 47.10.019 does not preclude termination of parental rights in this case.

■■■ Sean argues that AS 47.10.019 applies to his case. This statute provides:

---

permanent placement." AS 47.10.088. By its very terms, this statute permits OCS to pursue reunification while considering other permanent placements that may be in the child's best interests. In other words, the statute requires OCS to consider competing goals. *See also J.H. v. State, Dep't of Health & Soc. Servs.*, 30 P.3d 79, 88–89 (Alaska 2001) (rejecting the argument that termination of parental rights was improper where parent relied on case plan that was later changed).

28. In addition to challenging the legal sufficiency of the evidence under the statutory definition of reasonable efforts, Sean appears to challenge the factual finding that efforts to reunify him with Josh were unsuccessful because Sean failed to participate. Sean argues that OCS's mistakes or lack of commitment to reunification caused reunification plans to fail. As the discussion in the text makes clear, there is evidence in the record to support the finding that Sean's failure to participate was detrimental to reunification; this finding is not clearly erroneous.

29. Sean also argues that the superior court should not have reached the best interest inquiry because the other prongs of the AS 47.10.088 analysis were not satisfied. As explained in sections IV.A, IV.B, and IV.C of this opinion, we disagree.

30. AS 47.10.088(b).

31. *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008) ("[W]e have held that the fact that a child has bonded with her foster parent can be a factor in considering whether it is in the child's best interests to terminate a parent's rights."); *T.F. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 26 P.3d 1089, 1096 (Alaska 2001) (affirming "superior court's decision to terminate [that] depended in part on its finding that delay in permanent placement would harm the twins").

Notwithstanding other provisions of this chapter, the court may not find a minor to be a child in need of aid under this chapter solely on the basis that the child's family is poor, lacks adequate housing, or exhibits a lifestyle that is different from the generally accepted lifestyle standard of the community where the family lives. However, this section may not be construed to prevent a court from finding that a child is in need of aid if the child has been subjected to conduct or conditions described in AS 47.10.011–47.10.015.

Sean asserts that he "was not steadily employed and had indigent status." He suggests that he was faced with a dilemma: He was criticized if he did not have work and "blamed" when his work schedule interfered with attending meetings. The record and factual findings do not support this argument. Sean could have communicated his work schedule more clearly. Instead the record suggests that Sean relied on others to keep track of meetings concerning Josh. The superior court found that Sean expected "others would exert all the efforts" and "give him his child," rather than taking the initiative necessary to reunite with Josh. In light of these facts, AS 47.10.019 does not preclude the superior court's conclusions that Josh was a child in need of aid and that termination of Sean's parental rights was proper.

### 2. Alaska Statute 47.10.080(*o*) does not apply to this case.

 Sean also draws our attention to AS 47.10.080(*o*). This provision authorizes termination of parental rights where the parent is incarcerated. Sean suggests that this standard should have been applied in his case because he spent three weeks in county jail

while Josh was in OCS custody. In *Rick P. v. State, Office of Children's Services*,[32] we explained:

[Alaska Statute 47.10.080(*o*)] is merely an additional, independent authority OCS may rely on to terminate rights in cases where the parent's incarceration itself is likely to injure the child in the future; it does not supplant AS 47.10.088(a)(1)(A) and 47.10.011[] as grounds for terminating the rights of a parent who [meets the requirements under those statutes].[33]

The superior court was not required to apply AS 47.10.080(*o*) because AS 47.10.088(a)(1)(A) provides sufficient authority for terminating parental rights in this case.

### 3. Admission of Exhibit 11 does not constitute reversible error.

Sean also argues that the trial court improperly found that placement with him was denied as result of his non-cooperation with the Interstate Compact on the Placement of Children home study. However, the superior court did not make this specific finding. At most, the court considered evidence to that effect. While this does not appear to be error,[34] even if error it was harmless because there was sufficient other evidence in the record to support the superior court's conclusion that termination was justified under AS 47.10.088.

## V. CONCLUSION

For the above stated reasons, we AFFIRM the superior court's termination of Sean's parental rights.

---

**32.** 109 P.3d 950, 957 (Alaska 2005).

**33.** *Id.*

**34.** A memo authored by Carl Scott, who oversaw the home study conducted under the Interstate Compact on the Placement of Children, suggested that Sean failed to cooperate with the home study. This memo was admitted at trial as Exhibit 11. At first Sean objected to the admission of the memo because it was offered before the record's author had authenticated it; Carl Scott was later called to testify, apparently meeting that objection, because Sean had conceded that

the memo was admissible as a record kept in the ordinary course of business. The superior court admitted the memo, noting that its probative value was limited. Admission of the memo was at most harmless error. Aside from the memo, there is testimony in the record that the Arkansas Department of Health and Human Services denied placement because the Interstate Compact investigators were not able to meet with Sean. There is also sufficient evidence in the record that is unrelated to the home study and that supports the superior court's conclusions.