*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MOIRA M., | ) | |
| | ) | Supreme Court No. S-15952 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-13-00106 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 7088 – March 18, 2016 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Vanessa White, Judge.

Appearances: Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Kathryn R. Vogel, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee. Rachel Levitt, Assistant Public Advocate, Palmer, and Richard Allen, Public Advocate, Anchorage, Guardian Ad Litem.

Before: Stowers, Chief Justice, Fabe, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

BOLGER, Justice.

# I.   INTRODUCTION

The superior court terminated a mother's parental rights based on evidence that she failed to remedy her substance abuse and the danger this conduct posed to her child.  On appeal the mother first argues that the superior court erred when, prior to the termination trial, it denied her request for a visitation review hearing.  She also argues that, at the termination trial, the superior court erroneously reduced the Office of Children's Services's (OCS) burden to make reasonable reunification efforts after she moved out of state.  But the record and our case law support the superior court's decisions.  The superior court denied the visitation review hearing because OCS responded to the mother's motion for a hearing by issuing a family contact plan that appeared to fully address her concerns.  And the superior court's analysis of OCS's efforts properly considered the specific facts of her case.  Accordingly we affirm the superior court's decision to terminate parental rights.

# II.   FACTS AND PROCEEDINGS

## A.   Facts

Abel, born in September 2012, is the son of Moira and Sam.[1]  Sam died when Abel was three months old.  After Sam's death, Moira and Abel moved to Alaska with Moira's boyfriend, Jarvis.

In the early morning hours of August 29, 2013, Palmer police officer James Gipson noticed Moira walking alone along the road.  After Moira declined Gipson's offer of a ride, Gipson continued driving until he noticed a car parked in a gravel lot.  Gipson approached the car, discovered it was unlocked, and found an unattended infant in the back seat.  While Gipson was waiting for backup assistance, Moira entered the lot

---

[1]     We use pseudonyms throughout to protect the family's privacy.

and identified the car as belonging to her and the infant as her child. Gipson noticed signs of impairment in Moira's behavior and notified another officer to contact Moira while Gipson remained with the infant. Moira was taken into custody, and while in custody she admitted to using cannabis, asserted that she had used methamphetamine for the first time the night before,[2] and admitted that she had driven with Abel after using these drugs. Moira was ultimately charged with endangering the welfare of a child in the first degree, driving on a suspended license, driving under the influence, and misconduct involving a controlled substance.[3] After taking Moira into custody, the police released Abel into the custody of Jarvis's mother.

Based on this incident, the police sent OCS a protective services report regarding Abel, and OCS immediately began an investigation. OCS was initially unable to locate Moira or Abel for several days. Upon finding them, OCS took Abel into emergency custody, and the superior court granted OCS temporary custody. Because Moira did not want Abel placed with relatives outside of Alaska, Abel was placed in a foster home with a non-relative. OCS immediately began offering services to Moira: it scheduled urinalyses (UAs) and hair follicle tests for controlled substances for both Moira and Abel, arranged visitation, and offered to provide transportation to these services. Though Moira missed her first visit with Abel, she did meet with an OCS caseworker and submitted to UAs. The UAs came back positive for marijuana once in September 2013 and twice in October 2013.

---

[2] During the termination trial Moira asserted that she first tried methamphetamine while in high school.

[3] Moira ultimately pleaded guilty to endangering the welfare of a child and driving under the influence. The charges for misconduct involving a controlled substance and driving with a suspended license were dismissed.

OCS also referred Moira to the Akeela Assessment Center where she took a substance abuse assessment in September 2013. Moira reported that she had a history of using alcohol, marijuana, hallucinogens, amphetamines, and opiates. The substance abuse assessment concluded that Moira "exhibited a maladaptive behavioral pattern of dependence for cannabis, leading to clinically significant impairment or distress," and recommended outpatient services and ongoing UAs.

In October 2013 Moira was admitted to the Akeela Family Program, an outpatient counseling program. About one month later, OCS and Moira developed a case plan that required Moira to comply with the recommendations of her substance abuse assessment, submit to UA testing, participate in a psychological evaluation, attend parenting classes, and follow the visitation plan developed by Alaska Family Services. Moira participated in the Akeela Family Program until January 2014. During this period, she attended regular counseling sessions at Akeela, complied with regular UA testing, took parenting classes, and took a behavioral health assessment at Mat-Su Health Services. Moira also consistently visited Abel, generally multiple times per week, through March 2014. During these visits Moira exhibited many positive parenting attributes and few negative attributes, and she was able to meet many of the assigned parenting goals.

Despite Moira's initial progress toward her case plan goals, she also struggled. She admitted to using spice during this time, and she tested positive for opiates in November 2013 and for both methamphetamine and opiates in December 2013. As a result, her recommended drug treatment gradually increased from outpatient services to residential care. But after late December 2013, Moira failed to return to treatment at Akeela, and the next month she was discharged after reporting that she would seek outpatient treatment with Alaska Family Services.

Moira also began failing to maintain regular visitation with Abel. In spring 2014 she began attending fewer visits with him. Because Moira did not inform Alaska Family Services about her absences ahead of time, it periodically had to stop and re-start visitations. OCS also struggled to maintain contact with Moira, despite attempts to visit Moira's residence, calls to different phone numbers, and visits to her boyfriend's residence.

Moira's problems with law enforcement also continued. As a result of her August 2013 arrest, Moira was sentenced to 15 days in jail with three years probation and was ordered to participate in the Alcohol Safety Action Program as a probation condition. But she failed to complete that program, and the State accordingly moved to revoke her probation. In June 2014 she was arrested for shoplifting. The next month she was arrested on an outstanding warrant for violating her probation conditions; at that time, she reportedly admitted that she used heroin daily. In December 2014 she was indicted for heroin possession.[4]

## B.    Proceedings

In January 2014 the superior court adjudicated Abel a child in need of aid, and in March 2014, after an uncontested disposition hearing, the court committed Abel to OCS custody. OCS updated Moira's case plan in July 2014. Noting that Moira had made only initial progress, the updated plan recommended that Moira: (1) "complete a substance abuse assessment and follow all recommendations"; (2) "participate in a psychological evaluation and . . . follow all recommendations"; (3) "follow the family contact plan for supervision of visits with [Alaska Family Services] and for telephonic and face to face visits supervised by the foster parent," and (4) "develop appropriate

---

[4]     During the termination trial, Moira admitted to using heroin "[a] couple times in Alaska" and asserted that her use ended around August 2014.

parenting behaviors through parenting classes and . . . demonstrate these techniques while at visitations." OCS also recommended changing Abel's permanency goal from reunification to adoption. Moira opposed the permanency goal change, asserting that she had scheduled a psychological evaluation and planned to participate in an updated substance abuse assessment with Akeela.

After her case plan was updated, Moira again began following through with her case plan goals. In August 2014 she participated in a psychological evaluation with Dr. Michael Rose and a substance abuse assessment at Akeela Assessment Center. The substance abuse assessment found that Moira was dependent on amphetamines, cannabis, nicotine, and alcohol. Given Moira's recent and regular use, the assessment recommended detoxification as well as medium- or long-term residential treatment. The psychological evaluation diagnosed Moira with perpetrating child neglect, struggling with cannabis dependence and methamphetamine abuse (both in remission), and exhibiting possible borderline personality. The evaluation recommended that Moira abstain from using substances, engage in psychotherapy and substance abuse treatment, demonstrate fiscal responsibility, and pursue parenting education.

By the time Moira began to follow through with her case plan, however, the superior court had already approved adoption as Abel's permanency goal, finding that Moira had not made substantial progress toward her case plan goals and that it would be contrary to Abel's best interests to return him to her custody.[5] In September 2014 OCS notified Moira that it planned to relocate Abel to Washington to live with Kayla, Abel's paternal grandmother. Moira initially objected to this decision and requested a placement review hearing.

---

[5] Moira did not request a contested hearing.

The superior court held the placement review hearing in October 2014. Shortly before the hearing, OCS assigned caseworker Lynette Anselm to Abel's case, and she was able to meet with Moira and Kayla at the hearing. At the hearing, Moira changed her position and agreed that placing Abel with Kayla in Washington would serve his best interests. She also testified that she was looking into substance abuse treatment in Washington so that she could be closer to him.

Shortly after the placement review hearing, Abel moved to Washington to live with Kayla. OCS and Moira continued to communicate, but the extent of their communication is unclear. Moira also had telephonic contact with Abel after his move, but the extent of this contact is also not clear from the record. In December 2014, a few months after Abel's move, OCS petitioned to terminate Moira's parental rights.

In January 2015 Moira moved to Oregon to live with her family. At the time, she had open criminal cases in Alaska, and by the time of the termination trial in April 2015, multiple bench warrants had issued for her arrest. Once in Oregon, Moira applied to the ARC Center, a nearby substance abuse treatment facility, and was put on the wait list for an inpatient program. ARC offered Moira temporary outpatient treatment, but Moira initially declined. And while on the wait list, Moira did not look for work because employment was not readily available in the area.[6] But she did participate in Alcoholics Anonymous and Narcotics Anonymous once or twice a week.

After her move Moira attempted to call Abel through Kayla, but Kayla did not allow her to speak to him, telling her that OCS had cut off visitation. During this time OCS was trying to locate Moira, and Anselm, the OCS caseworker, believed that Moira was incarcerated in Alaska. According to Anselm, Moira did not tell OCS that she

---

[6] Moira explained that she occasionally worked for her grandparents to cover rent, but she did not ask them for additional work because she was focused on treatment.

planned to move to Oregon, and Anselm was not aware of Moira's plans until after she moved. After Kayla denied Moira contact with Abel, Moira's attorney contacted OCS in mid-January for clarification but heard no response and thus contacted OCS again in mid-February. At a pretrial hearing in late January, Moira's attorney also noted that Moira was living in Oregon and raised the issue of visitation. Anselm testified that these communications marked the first time she knew for certain that Moira was residing in Oregon.

Because she was unable to discuss visitation with OCS, Moira filed a motion in mid-February 2015 requesting a visitation review hearing.[7] She asked the court to review whether OCS was complying with its obligation to provide her with reasonable visitation[8] and to require OCS to prove by clear and convincing evidence that visitation was not in Abel's best interests.[9] Moira claimed that she had not had in-person or phone contact with Abel since December 2014 and that OCS had not directly responded to her requests for visitation. Moira asserted that, in effect, OCS had denied visitation with Abel.

In response, OCS established a family contact plan. The plan provided for Kayla to call Moira three days per week and for the calls to last up to five minutes. It also provided for supervised visitation between Moira and Abel once a week set up by Washington Child Protective Services. OCS thereby opposed Moira's motion for a

---

[7]     *See* CINA Rule 19.1(a) ("At any time in a proceeding, a parent . . . who has been denied visitation . . . may move the court for a review hearing at which [OCS] must show by clear and convincing evidence that visits are not in the child's best interests.").

[8]     See AS 47.10.080(p) ("If a child is removed from the parental home, [OCS] shall provide reasonable visitation between the child and the child's parents . . . .").

[9]     *See* CINA Rule 19.1(a) (requiring OCS to demonstrate by clear and convincing evidence that "visits are not in the child's best interests").

hearing and rejected Moira's "assertion that visitation has been denied." The court then denied Moira's motion "because OCS ha[d] established a family contact plan," but it noted that OCS should be prepared to address the apparent delay in establishing this plan at the termination trial.

The termination trial was held in April 2015. Moira, testifying telephonically, explained that since she moved to Oregon she had limited phone access, but she had been leaving a message with Kayla when she wanted to talk with Abel. She described her contact with Abel at the time of the trial as follows:

> I get to talk to him as much as I can . . . get a hold of [Kayla] or [she can] get a hold of me because my phone situation has been hard because I've just not been working[,] and I've still been trying to get into my treatments and joining [Narcotics Anonymous] groups, and [Alcoholics Anonymous] groups as much as I can.

Dr. Rose testified as an expert witness based on his psychological examination of Moira. He asserted that unless Moira engaged in treatment, any child living with her would be at risk of harm. Finally, Anselm testified about her interactions with Moira and noted her difficulty communicating with Moira throughout the case.

At the close of the termination trial, the superior court issued oral and written findings terminating Moira's parental rights. The court found that Abel was a child in need of aid because of Moira's substance abuse. Noting Moira's relapses, decision to decline outpatient treatment, token participation in Alcoholics Anonymous and Narcotics Anonymous, decision to flee Alaska, failure to maintain contact with OCS, and failure to maintain consistent contact with Abel, the court determined that Moira had failed to remedy the conduct that put Abel at substantial risk of harm. The court also found that OCS made reasonable efforts to promote reunification throughout the case. And it found Moira not credible and determined that OCS's reasonable efforts burden

was necessarily reduced after Moira left Alaska and failed to provide reliable contact information. Finally the court found that returning Abel to Moira's care would be contrary to his best interests.

Moira appeals the termination of her parental rights to Abel.

## III. STANDARD OF REVIEW

We review a trial court's decision to deny a review hearing for abuse of discretion.[10] "A trial court abuses its discretion only if its decision arises from an improper motive or is arbitrary, capricious, or manifestly unreasonable."[11]

"Whether factual findings satisfy the requirements of the applicable child in need of aid . . . statute is a question of law that we review de novo,"[12] adopting the rule of law most persuasive in light of precedent, reason, and policy.[13]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion In Denying Moira's Request For A Visitation Review Hearing.

In her motion for a visitation review hearing, Moira argued that OCS violated her right to reasonable visitation under AS 47.10.084(c) and AS 47.10.080(p). She noted her attempts to contact OCS and restart visitation, and she asserted that OCS's failure to respond to her inquiries constituted a de facto denial of visitation with Abel.

---

[10] *Lara S. v. State, Dep't of Heath & Soc. Servs., Office of Children's Servs.*, 209 P.3d 120, 124 (Alaska 2009).

[11] *Id.* at 124-25.

[12] *Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 353 P.3d 831, 837 (Alaska 2015) (citing *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 246 P.3d 916, 920 (Alaska 2011)).

[13] *Susan M. v. Paul H.*, 362 P.3d 460, 463 (Alaska 2015) (quoting *Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005)).

Moira concluded that she was entitled to a review hearing under AS 47.10.080(p) and CINA Rule 19.1(a).

The right to reasonable visitation for parents whose parental rights have not been terminated originates from AS 47.10.084(c), which provides: "When there has been transfer of legal custody . . . and parental rights have not been terminated by court decree, the parents shall have residual rights and responsibilities. These residual rights and responsibilities of the parent include . . . the right and responsibility of reasonable visitation . . . ." Alaska Statute 47.10.080(p) explains what constitutes reasonable visitation:

> When determining what constitutes reasonable visitation . . . , [OCS] shall consider the nature and quality of the relationship that existed between the child and the family member before the child was committed to the custody of [OCS]. . . . [*OCS*] *may deny visitation to the parents* . . . if there is clear and convincing evidence that visits are not in the child's best interests. *If* [*OCS*] *denies visitation to a parent* . . . , [OCS] shall inform the parent . . . of a reason for the denial and of the parent's . . . right to request a review hearing as an interested person. A parent . . . who is denied visitation may request a review hearing. (Emphases added.)

CINA Rule 19.1(a) similarly provides that a parent who has been denied visitation may move for a hearing "at which [OCS] must show by clear and convincing evidence that visits are not in the child's best interests."

On appeal Moira argues that the superior court erred when it denied her motion for a visitation review hearing. She claims that the family contact plan established by OCS, which relied on Kayla calling Moira and on Moira traveling to Washington to visit Abel, was unreasonable given Moira's limited access to a phone and lack of driver's license. Had the court granted her motion for a visitation review hearing, she asserts that she would have demonstrated the plan was impractical. Moira further

claims that after denying her motion for a review hearing, the court used her inability to follow the plan against her when it terminated her parental rights. She concludes that the court's failure to grant the hearing prejudiced her case at the termination trial and accordingly asks us to reverse the superior court's decision.

Moira's argument overlooks the fact that, after OCS filed its family contact plan, Moira did not file a reply opposing the plan nor did she challenge its inadequacy at the termination trial. Moira's motion for a visitation review hearing, which was filed before OCS established its family contact plan, alleged that OCS had not responded to her requests for visitation and had therefore effectively denied her visitation. And though Moira supported the motion with examples of her correspondence with OCS, those exhibits did not show that OCS objected to visitation. "[B]ecause OCS ha[d] established a family contact plan," which appeared to address Moira's concerns, the court denied the motion.

Moira argues that the family contact plan did not conclusively establish that she no longer was suffering a de facto termination of her visitation rights. Moira also argues that even if OCS's family contact plan established that she did not suffer a de facto termination of her visitation rights, there was still an ongoing controversy warranting a review hearing, because the superior court could have given Moira additional relief by augmenting the family contact plan.

However, when the superior court denied the motion for a review hearing, it had no way of knowing that Moira objected to the family contact plan. The sole issue that Moira raised in her motion was a lack of visitation; she requested "a review hearing to address *the denial of visitation*." (Emphasis added.) The motion did not mention any concerns with phone access or transportation. The family contact plan provided visitation through both phone contact and in-person visits. It thus granted Moira all the relief she requested in her motion.

It is unclear why the superior court would need to hold a hearing to review the denial of visitation when OCS had already established a visitation plan and permitted visitation. Accordingly it was reasonable for the superior court to conclude that OCS had resolved the sole issue before it, lack of visitation, and that the matter no longer fell under CINA Rule 19.1(a), which provides for review hearings when visitation has been denied. Thus the superior court did not err when it denied Moira's motion.[14]

B.     **The Superior Court Did Not Erroneously Lower OCS's Burden To Make Reasonable Efforts**.

Before terminating parental rights, a court must find that OCS "has complied with the provisions of AS 47.10.086 concerning reasonable efforts."[15] Alaska Statute 47.10.086(a) requires OCS to "make timely, reasonable efforts to provide family support services to the child and to the parent[] . . . that are designed to . . . enable the safe return of the child to the family home." Such reasonable efforts include "identify[ing] family support services that will assist the parent . . . in remedying the conduct or conditions in the home that made the child a child in need of aid" and "actively offer[ing] . . . and refer[ring] the parent" to such services.[16] The statute also provides limited exceptions to the requirement that OCS make reasonable efforts.[17]

---

[14]     Because we resolve Moira's appeal on these grounds, we do not address the constitutional arguments regarding her right to visitation that she also makes on appeal.

[15]     AS 47.10.088(a)(3).

[16]     AS 47.10.086(a)(1)-(2).

[17]     AS 47.10.086(b)-(c).

When reviewing a superior court's reasonable efforts determination, we evaluate OCS's efforts in light of the specific facts of each case.[18] We also have held that a superior court may determine at the termination trial that the reasonable efforts requirement is excused.[19]

Consistent with our case law, the superior court evaluated OCS's efforts in light of the specific facts of this case. The court found:

> Reasonable efforts have been made by [OCS] at all times. Necessarily those efforts were reduced when [Moira] relocated and did not have reliable contact information. [OCS] ha[s] to be able to contact her to engage in efforts. But that was [Moira's] choice. She has not been proactive in addressing . . . what she says is the reason for her choice, more significant contact with her son.

---

[18] *See, e.g.*, *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1241 (Alaska 2015) ("Reunification efforts need not be perfect; they need only be reasonable under the circumstances depending upon: the parent's substance abuse history . . . ; her willingness to participate in treatment; the history of services provided by OCS; and the parent's level of cooperation with OCS's efforts. The reasonableness of OCS's efforts may also depend on the parent's expressed interest in parenting, with OCS's responsibility for reunification efforts decreasing as the parent's interest decreases." (footnotes omitted)); *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 432 (Alaska 2012) ("We have acknowledged that the State has some discretion both in determining what efforts to pursue and when to pursue them."); *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.* 251 P.3d 330, 338 (Alaska 2011) ("A parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide.").

[19] *Vivian P. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 78 P.3d 703, 709 (Alaska 2003) ("But the fact that [OCS] is precluded from determining on its own that reasonable efforts are unnecessary under AS 47.10.086(c)(1) does not preclude the court from determining after commencement of a termination trial that the reasonable efforts requirement is excused.").

Moira argues that the statutory scheme requires OCS to make reasonable efforts unless the superior court, after notice and hearing, decides that the specific circumstances obviate the need for reasonable efforts. She asserts that analyzing OCS's efforts in light of the specific circumstances of each case improperly empowers OCS to abdicate its responsibility to make reasonable efforts, in contravention of the statutory scheme. This approach, she explains, deprives litigants of notice of outcome-determinative issues and "conflicts with notions of fundamental fairness and notice," because this approach allows courts to determine, after the fact, whether OCS had a reduced burden to make reasonable efforts.

Moira's arguments are not persuasive. Although the statutory scheme recognizes the superior court's role in determining whether OCS may cease making reasonable efforts,[20] Moira does not identify a statutory requirement that OCS efforts be deemed reasonable *before* a termination trial. The statute does not require such a pre-trial finding.

Further, Moira's claim that the approach unfairly deprives a parent of notice about what efforts OCS might make also lacks merit. Waiting to review the reasonableness of OCS efforts until the termination trial does not allow OCS to evade its responsibility to provide objectively reasonable efforts. It provides a check to ensure

---

[20] AS 47.10.086(b) (providing that the reasonable efforts requirement may be excused "[i]f the court makes a finding at a [permanency] hearing" that the parent has not sufficiently remedied the conduct or conditions that led to the commencement of proceedings); AS 47.10.086(c) (providing that "[t]he court may determine that reasonable efforts . . . are not required if the court has found by clear and convincing evidence" that one of many enumerated aggravated circumstances exist).

that OCS met its obligation in light of the specific circumstances of each case. Our precedents very clearly identify the efforts that parents should expect: reasonable efforts under the circumstances.[21]

Finally, Moira claims that the superior court improperly lowered OCS's burden to prove reasonable efforts after her move to Oregon. She argues that we should reverse the court's reasonable efforts finding, because the court blamed Moira for leaving Alaska when it terminated her parental rights. She claims the court thereby "diluted OCS's burden, failed to honor the statutory scheme instructing OCS to seek advance permission to suspend efforts, and deprived Moira of adequate notice that her relocation would be used against her in this manner."

But Moira's argument takes the court's finding out of context; in its oral findings the court stated: "Reasonable efforts have been made by [OCS] at all times. Necessarily those efforts were reduced when [Moira] relocated and did not have . . . reliable contact information." This finding is reasonable based on the testimony of OCS caseworker Anselm and Moira about the difficulty that Moira had with telephone communication after she moved to Oregon. Anselm testified that OCS had trouble communicating with Moira throughout the case, including before Moira's move, because Moira's phone number and address frequently changed and because she did not respond to voicemails and letters. Moira's move only exacerbated these communication issues: Anselm explained that Moira did not inform OCS that she was moving to Oregon, and Anselm did not know her whereabouts for some time. Anselm further testified that she

---

[21]     *See, e.g.*, *Shirley M.*, 342 P.3d at 1241-42; *Sherman B.*, 290 P.3d at 432-33; *Sean B.*, 251 P.3d at 338-39.

had been unsuccessful in directly contacting Moira after she moved to Oregon. Anselm also stated that Moira never told her that she had limited phone access and never provided OCS with an email address.

Moira's testimony acknowledged that she had irregular contact with both Abel and OCS because of her unreliable access to a telephone. She explained that she was living in a rural area in Oregon, and her mother, the only person in the house with a working cell phone, was often out of town. And she asserted that she could not afford her own phone because she had not been working. Together, Moira's and Anselm's testimony support the superior court's finding that OCS made reasonable efforts to facilitate reunification given the specific facts of this case. Moira does not challenge the superior court's factual findings on this issue; and the court's findings about the efforts OCS made are well supported.

The superior court followed our precedents in analyzing the reasonableness of OCS's efforts: it did not err in determining that a decreased level of communication was reasonable given the circumstances of Moira's move.

## V.    CONCLUSION

Because the superior court did not abuse its discretion in denying Moira's motion for a placement review hearing and properly applied our precedents when finding that OCS made reasonable efforts, we AFFIRM the superior court's termination of Moira's parental rights.